## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILMINA SHIPPING AS<br>Beddingen 8 Aker Brygge<br>Oslo, Norway NO-0118<br>and<br>WILHELMSEN MARINE<br>SERVICES AS<br>Beddingen 8 Aker Brygge<br>Oslo, Norway NO-0118<br><br>                    Plaintiffs,<br><br>        v.<br><br>UNITED STATES DEPARTMENT<br>OF HOMELAND SECURITY<br>3801 Nebraska Ave., NW,<br>Nebraska Avenue Complex<br>Washington, D.C. 20016<br>and<br>UNITED STATES COAST GUARD,<br>2100 Second Street, SW, Room 1413<br>Washington, DC 20593<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____<br><br>**COMPLAINT** |

## COMPLAINT

COMES NOW WILMINA SHIPPING AS, as owner of the M/T WILMINA and

WILHELMSEN MARINE SERVICES AS, as technical manager of the M/T WILMINA,

by and through its undersigned counsel, Chalos O'Connor, LLP, and alleges and states as

follows:

### THE PARTIES

1.     Plaintiff Wilmina Shipping AS is a foreign corporation with offices in

Oslo, Norway.  Wilmina Shipping AS is the owner of the M/T WILMINA.

2.     Plaintiff Wilhelmsen Marine Services AS is a foreign corporation with offices in Oslo, Norway. Wilhelmsen Marine Services AS is the technical manager of the M/T WILMINA.

3.     Defendant, the United States Department of Homeland Security, is a Department of the United States, with an office at 3801 Nebraska Ave., NW, Nebraska Avenue Complex, Washington, D.C. 20016.

4.     Defendant, the United States Coast Guard, is an agency of the United States government under the Department of Homeland Security, with an office at 2100 Second Street, SW, Washington, DC 20593.

5.     The United States Coast Guard issued the final agency action that is the subject of this Complaint on November 1, 2011.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper pursuant to the following statutes: (1) 28 U.S.C. § 1331 (federal question), (2) 5 U.S.C. § 701, *et seq.*, (Administrative Procedures Act, hereinafter the "APA"), and (3) 28 U.S.C. § 1333 (admiralty and maritime jurisdiction).

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), as this action is commenced against an agency of the United States government, the U.S. Coast Guard.

## BACKGROUND OF CLAIM

8.     On May 21, 2010, following the M/T WILMINA's port call at Corpus Christi, Texas on May 4, 2010, the Coast Guard Captain of the Port, Sector Corpus Christi, issued Captain of the Port Order (hereinafter "COTP") No. 093-10, which alleged that the M/T WILMINA had discharged oily waste in contravention of the International

Convention to Prevent Pollution from Ships ("MARPOL"), to which both the vessel's Flag state, Norway, and the United States are parties. A true and accurate copy of COTP Order No. 093-10 is attached hereto and made part of the Complaint as Exhibit 1.

9.    In the COTP Order No. 093-10, the Coast Guard asserted, without providing the Plaintiffs any notice or opportunity to be heard, that the vessel "create[d] a threat to the marine environment of the United States," and summarily banned the M/T WILMINA from calling at any port within the Sector Corpus Christi Marine Inspection Zone for three (3) years, or, in the alternative, for a period of at least one (1) year after successful implementation of an Environmental Compliance Plan ("ECP") approved by the Commandant of the Coast Guard, at which point the COTP would "consider" allowing the vessel to enter the Sector Corpus Christi Marine Inspection Zone again.

10.    On May 27, 2010, the Coast Guard Office of Vessel Activities issued its Order No. 16711, which extended the ban imposed on the M/T WILMINA by COTP Order No. 093-10, to all U.S. ports and U.S. navigable waters. A true and accurate copy of the Office of Vessel Activities Order No. 16711 is attached hereto and made part of the Complaint as Exhibit 2. (hereinafter and collectively with COTP Order No. 093-10, "the Coast Guard Orders"). No notice was provided to the Plaintiffs, nor were the Plaintiffs given an opportunity to be heard prior to the issuance of Office of Vessel Activities Order No. 16711.

11.    As more fully described herein, the M/T WILMINA was and is operated to the highest standards of the marine transportation industry, and was, and continues to be, voluntarily subjected to the most rigorous inspection regime of any oceangoing cargo ships in the world.

12.     The Coast Guard issued the Coast Guard Orders without any legal or factual basis, without providing Plaintiffs any notice or opportunity to be heard, and without any authorization in the controlling statute, the Port and Waterways Safety Act, 33 U.S.C. § 1221, *et seq.* (hereinafter "PWSA").

13.     Plaintiffs appealed the Coast Guard Orders through the four levels of the Coast Guard's administrative appeals process,[1] commencing on August 20, 2010, and these appeals were summarily denied at every level by the Coast Guard. Copies of Plaintiffs' appeals to the Sector Commander,[2] District Commander,[3] Area Commander,[4] and Office of the Commandant[5] are attached hereto and made of part of the Complaint as

---

1 The administrative appeals process is controlled by 33 C.F.R. § 160.7(a) – (d).

2 "Any person directly affected by a safety zone or an order or direction issued under this subchapter may request reconsideration by the official who issued it or in whose name it was issued. This request may be made orally or in writing, and the decision of the official receiving the request may be rendered orally or in writing." *See* 33 C.F.R. § 160.7(a).

3 "Any person directly affected by the establishment of a safety zone or by an order or direction issued by, or on behalf of, a Captain of the Port may appeal to the District Commander through the Captain of the Port. The appeal must be in writing, except as allowed under paragraph (e) of this section, and shall contain complete supporting documentation and evidence which the appellant wishes to have considered. Upon receipt of the appeal, the District Commander may direct a representative to gather and submit documentation or other evidence which would be necessary or helpful to a resolution of the appeal. A copy of this documentation and evidence is made available to the appellant. The appellant is afforded five working days from the date of receipt to submit rebuttal materials. Following submission of all materials, the District Commander issues a ruling, in writing, on the appeal. Prior to issuing the ruling, the District Commander may, as a matter of discretion, allow oral presentation on the issues." *See* 33 C.F.R. § 160.7(b).

4 "Any person directly affected by the establishment of a safety zone or by an order or direction issued by, or on behalf of, a District Commander, or who receives an unfavorable ruling on an appeal taken under paragraph (b) of this section may appeal to the Area Commander through the District Commander. The appeal must be in writing, except as allowed under paragraph (e) of this section, and shall contain complete supporting documentation and evidence which the appellant wishes to have considered. Upon receipt of the appeal, the Area Commander may direct a representative to gather and submit documentation or other evidence which would be necessary or helpful to a resolution of the appeal. A copy of this documentation and evidence is made available to the appellant. The appellant is afforded five working days from the date of receipt to submit rebuttal materials. Following submission of all materials, the Area Commander issues a ruling, in writing, on the appeal. Prior to issuing the ruling, the Area Commander may, as a matter of discretion, allow oral presentation on the issues." *See* 33 C.F.R. § 160.7(c).

5 "Any person who receives an unfavorable ruling on an appeal taken under paragraph (c) of this section, may appeal through the Area Commander to the Assistant Commandant for Prevention (formerly known as the Assistant Commandant for Marine Safety, Security and Environmental Protection), U.S. Coast Guard, (CG-5), 2100 2nd St. SW., Stop 7355, Washington, DC 20593-7355. The appeal must be in writing, except as allowed under paragraph (e) of this section. The Area Commander forwards the appeal, all the documents and evidence which formed the record upon which the order or direction was issued or the

Exhibit "3". Copies of the Coast Guard's denials are attached hereto and made part of the Complaint as Exhibit "4".

14. The administrative appeals process concluded on November 1, 2011, with the issuance of the final agency action by the Commandant of the Coast Guard, which upheld the Coast Guard Orders in their entirety. *See* Exhibit 4.

15. In accordance with the provisions of the APA, 5 U.S.C. § 704, the Plaintiffs have exhausted their administrative remedies, and the Coast Guard's final agency action in this matter is ripe for judicial review pursuant to the APA.

16. As more fully set forth herein, the Coast Guard Orders must be vacated, pursuant to 5 U.S.C. § 706, because they are, (A) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (B) in an impermissible derogation of Plaintiffs' constitutional right, power, privilege, or immunity; (C) in excess of the Coast Guard's statutory authority; (D) issue without observance of procedures required by law; (E) not supported by credible evidence; and, (F) unwarranted by the facts which will be established when this Court conducts a de novo review of the administrative action.[6]

---

ruling under paragraph (c) of this section was made, and any comments which might be relevant, to the Assistant Commandant for Prevention. A copy of this documentation and evidence is made available to the appellant. The appellant is afforded five working days from the date of receipt to submit rebuttal materials to the Assistant Commandant for Prevention. The decision of the Assistant Commandant for Prevention is based upon the materials submitted, without oral argument or presentation. The decision of the Assistant Commandant for Prevention is issued in writing and constitutes final agency action." *See* 33 C.F.R. § 160.7(d).

6 *See* 5 U.S.C. § 706.

## FACTUAL BACKGROUND

### The Vessel

17.     The M/T WILMINA is an ocean going motorized tank vessel built in 1997 (hereinafter, the "vessel"). *See* Exhibit 5, Vessel Particulars. The vessel is registered in Norway and operates pursuant to the laws and authority of Norway. *See id.* The vessel's classification society is Det Norske Veritas ("DNV"). *See id.*

18.     Prior to the issuance of the Coast Guard Orders, the M/T WILMINA had been inspected numerous times by the U.S. Coast Guard and foreign Port State Control authorities, had been audited by its technical manager, Plaintiff Wilhelmsen Marine Services AS, and the vessel's classification society, DNV. The M/T WILMINA was also subject to numerous vetting inspections by inspectors representing most of the oil majors. All of these inspections and audits concluded the vessel was in excellent condition and fully compliant with all applicable marine environmental and safety laws and regulations.

### The Initial Coast Guard Inspection

19.     One day prior to the vessel's arrival at Corpus Christi, Texas, on May 3, 2010, a former member of the vessel's engine department, Fitter Robert Pabillar, contacted the Coast Guard.  Pabillar is a disgruntled former employee, who was terminated for cause prior to the vessel's arrival in Corpus Christi, after a hearing regarding his conduct on board the vessel was conducted by other shipmates in accordance with the company's grievance procedures. *See* Exhibit 6, Termination Notice for Robert Pabillar.

20.     In a self admitted effort to "get even with the Company" and in hopes of receiving a reward pursuant to 33 U.S.C. § 1908(a), Pabillar alleged to the Coast Guard

that the vessel had bypassed its pollution control equipment to discharge oily bilge waste directly overboard.

21.     On May 4, 2010, the M/T WILMINA arrived at Public Oil Dock #1 in Corpus Christi, Texas to discharge a cargo of crude oil. That same day, the Coast Guard boarded the vessel, conducted a comprehensive Port State Control Inspection and issued a Certificate of Compliance, which certified the vessel was in compliance with all applicable U.S. and international marine safety and environmental protection standards. *See* Exhibit 7, Port State Control Report, dated May 4, 2010; *see also* Exhibit 8, Certificate of Compliance, dated May 4, 2010.

22.     In accordance with the procedures set forth in the U.S. U.S. Coast Guard Foreign Tank Vessel Examination Book, the Coast Guard conducted a comprehensive inspection of the M/T WILMINA. *See* Exhibit 9, U.S. Coast Guard Foreign Tank Vessel Examination Book.

23.     Despite having received a report from Pabillar the previous day that the vessel had allegedly improperly discharged bilge waste, the Coast Guard's May 4, 2010 Certificate of Compliance examination confirmed that the vessel's pollution control equipment, including the vessel's oily water separator (hereinafter "OWS") and incinerator, were fully functional,[7] there was no evidence that the vessel had improperly discharged any bilge waste, and therefore the Coast Guard certified that "**the [M/T WILMINA] has been examined and found to be in compliance with all applicable**

---

7 The OWS is a type of oil pollution prevention equipment required onboard all oceangoing vessels of greater than 400 gross tons. The OWS separates water from oily waste allowing any water containing less than 15 parts per million ratio of oil to water to be properly discharged overboard. Bypassing the OWS would allow water containing a ratio of greater than 15 parts per million of oil to water to be discharged overboard, in violation of MARPOL.

**U.S. and international marine safety and environmental protection standards.**" *See* Exhibit 8 (emphasis added). This was the only true, unbiased and impartial examination of the vessel conducted by the Coast Guard after the vessel's arrival in Corpus Christi on May 4, 2010.[8]

<strong>Expanded MARPOL Examination</strong>

24.     In the evening of May 4, 2010, after the issuance of the Certificate of Compliance, the Coast Guard re-boarded the vessel to conduct an "expanded MARPOL examination." This examination was performed solely based on the false allegations made by Pabillar, an individual that had been terminated for cause and was motivated to make "the company pay for his termination", and Cesar Cruz, a motorman whom Pabillar extorted[9] to support the allegations.

25.     Following the expanded MARPOL examination, the Coast Guard issued a second Port State Control Report. *See* Exhibit 13, Port State Control Report, dated May 6, 2010.

26.     Relying solely on the allegations of Pabillar and Cruz, and in complete disregard of the findings of compliance with all applicable environmental regulations made by the Coast Guard during the Certificate of Compliance examination, the Coast Guard alleged in the second Port State Control Report that the M/T WILMINA had a

---

8 All subsequent examinations were done by the Coast Guard solely to bolster and support the unfounded and false allegations of Pabillar and Cruz.

9 As more fully described herein, Pabillar extorted Cesar Cruz to support Pabillar's allegations, by threatening to show Cruz's wife, a series of photographs of Cruz engaged in explicit sexual activity with women other than his wife. *See* Exhibit 10, Declaration of Waldemar Kaluzinski; *see also* Exhibit 11, Declaration of Mariusz Dolega; Exhibit 12, Declaration of Ryzard Stosik. Cruz confessed that he had been extorted by Pabillar to the vessel's First Assistant Engineer, Waldemar Kaluzinksi and Second Assistant Engineer Mariusz Dolega, and the photographs utilized by Pabillar to extort Cruz were seen by the vessel's Steward, Ryszard Stosik on one of the vessel's computers and were subsequently recovered by Plaintiffs from this computer. *See id.*

8

number of deficiencies, as follows: "after observing inconsistent entries in the oil record book and receiving information on a MARPOL violation from the crew, PSCO's expanded scope of engine room examination, allegedly determined that the oily water separator equipment is inoperable, discharge piping leading through the hull from Oily Water Separator was removed, thick oily sludge discovered on inside of discharge piping, valves, and skin valve. Oily water by-pass hose and flanges found in chemical locker with oily sludge inside the hose." *Id.*

### Detention of Vessel

27.     On May 5, 2010, Captain Paulison, United States Coast Guard, Captain of the Port – Corpus Christi, issued a letter which stated the M/T WILMINA had been detained by the United States Customs and Border Protection (hereinafter "CBP") agency and the Vessel's departure clearance had been withheld by CBP as of May 5, 2010. *See* Exhibit 14, Letter from Captain Paulison, dated May 5, 2010.

28.     Numerous attempts to negotiate the release of the vessel with the Coast Guard Legal Office for the Eighth Coast Guard District were unsuccessful, and on May 14, 2010, an action was filed in the United States District Court for the Southern District of Texas to obtain the release the M/T WILMINA from its detention. *See Wilmina Shipping As et al. v. United States et al.*, S.D. Texas Index No. 2:10-cv-137.

29.     The District Court held hearings on the petition to release the vessel on May 17, 2010 and May 19, 2010.

30.     Prior to the May 19, 2010 hearing, and well before the issuance of a judgment in the *Wilmina Shipping As et al.* action, the United States Coast Guard became aware that Pabillar had imported and possessed child pornography on the very same cell

phone that he told the Coast Guard contained pictures of a "mock-up" depiction of the use of an alleged by-pass hose that was surreptitiously rigged by him and Cruz in the middle of the night when no other crewmembers were in the vessel's engine room. *See* Exhibit 15, Complaint - *United States v. Pabillar*, S.D. Texas Index No. 2:10-cr-623, at p. 2 -5 (stating the Coast Guard notified Immigration and Customs Enforcement (ICE) regarding child pornography on Pabillar's mobile phone on May 18, 2010, and that ICE immediately commenced a criminal investigation of Pabillar for the illegal possession and importation of child pornography); *see also* Exhibit 16, Indictment – *United States v. Pabillar*, S.D. Texas Index No. 2:10-cr-623, at p. 1 – 3.

31.     None of this information was ever provided by the Coast Guard to Plaintiffs or the Court during the pendency of the motion to obtain the release of the vessel.

32.     As set forth in the criminal Complaint and Indictment, on May 4, 2010, Pabillar imported into the United States a video titled "The Virgin!.3gp", which depicted, "a minor female engaged in sexually explicit conduct to include the lascivious exhibition of the genitals and pubic area, as well as sexual intercourse, specifically vaginal penetration by an adult male penis." *See* Exhibit 15, Complaint, at p. 4.

33.     Pabillar admitted to CGIS Agents on May 18, 2010 that he had downloaded this video ("The Virgin!.3gp") to his cell phone while he was in the Philippines, that he knew this was one of the better known child pornography videos, and that possession of this video was illegal in the United States and the Philippines. *See id.*

34.     Despite the overwhelming evidence and Pabillar's own admissions of guilt, in October 2010, the United States inexplicably summarily dismissed the charges

against Pabillar in the "interest of justice." *See* Exhibit 17, Order of Dismissal, dated October 12, 2010. A review of the court's docket provides no basis or grounds for the sudden dismissal of the Indictment and pending criminal action against Pabillar.[10]

35.     Pabillar was subsequently deported from the United States, prior to the Plaintiffs' being given any opportunity to question him under oath regarding his false allegations which form the exclusive basis for the Coast Guard Orders banning the M/T WILMINA from the ports and navigable waters of the United States.

### Issuance of Coast Guard Orders

36.     On May 20, 2010, completely unaware of the true situation regarding Pabillar, on whose allegations the vessel was detained, Plaintiffs, as owner and technical manager of the M/T WILMINA, in order to obtain the release of the vessel, executed an Agreement on Security to have the Customs hold on the vessel released. *See* Exhibit 18, Agreement on Security, dated May 20, 2010.

37.     One day later, on May 21, 2010, the Coast Guard, without explanation, informed counsel for Plaintiffs that the criminal investigation had been terminated and no criminal charges would be brought against any of the vessel's crewmembers or the owner and technical manager of the vessel for alleged knowing violations of U.S. law.

38.     However, later that day, the Coast Guard issued Captain of the Port Order 093-10 which stated: (1) the M/T WILMINA would not be permitted to depart from the United States until the Master and Engineering Officers had been removed from the

---

10 Plaintiffs were given no notice of the dismissal of the Indictment or Pabillar's sudden deportation from the United States by the government, thus depriving Plaintiffs of an opportunity to cross examine him under oath.

vessel;[11] and, (2) the M/T WILMINA would be barred from entering the Sector Corpus Christi Marine Inspection Zone and Captain of the Port Zone for a period of three years. *See* Exhibit 1, Captain of Port Order 093-10, dated May 21, 2010.

39.    In violation of the PWSA, the U.S. Constitution, and the APA, the Plaintiffs were provided with no notice, hearing or adversarial proceedings of any kind prior to the issuance of this Order by the Coast Guard.

40.    In Captain of Port Order 093-10, the Coast Guard asserted, without providing any factual support for its allegations, that: (1) the vessel's oil record book contained "inconsistencies"; (2) the vessel's OWS was "inoperable"; (3) there was oil residue found in the overboard discharge piping of the OWS; (4) there was a bypass hose recovered from the vessel; (5) the vessel's Master and Chief Engineer failed to abide by the requirements of the vessel's Safety Management System (hereinafter "SMS") regarding the reporting of critical equipment casualties; and, (6) the vessel discharged oily water in contravention of MARPOL on several occasion. *See id.*

41.    Based on these unsupported allegations, which to date continue to be unsupported, the Coast Guard alleged that the M/T WILMINA was, "not operating in compliance with United States and International marine safety and environmental protection laws and that the presence of [the M/T WILMINA] creates a threat to the marine environment of the United States," and the vessel's owner, technical manager and senior officers had failed to effectively implement the vessel's SMS (i.e., by failing to

---

11 The Coast Guard and U.S. Customs and Border Protection required that Cesar Cruz be repatriated on an expedited basis and conditioned the granting of Customs clearance for the M/T WILMINA on Mr. Cruz leaving the United States. This precluded counsel for the Plaintiffs interviewing Mr. Cruz and securing his exculpatory testimony regarding Pabillar extortion of Cruz to support Pabillar's baseless allegations of misconduct.

report the alleged inoperability of the vessel's OWS and incinerator, which were in fact fully operational at all times relevant to this Complaint). *See id.*

42.    On May 27, 2010, the Coast Guard's Office of Vessel Activities issued an Order to all Captains of Ports and Officers in Charge of Marine Inspection throughout the United States. *See* Exhibit 2, Letter dated May 27, 2010. This Office of Vessel Activities Order summarily barred the M/T WILMINA from entering, "all ports or places in the United States for a period of three (3) years or until the vessel has developed and successfully implemented an ECP to a satisfaction of my officer.(sic). . . Successful implementation of an agreed upon ECP must include a satisfactory period of third party audits for at least one (1) year period after which the vessel may be allowed entry." *Id.*

### Exhaustion of Administrative Appeals

43.    On June 9, 2010, the Plaintiffs filed their administrative Notice of Appeal of the Coast Guard's Orders. *See* Exhibit 19, Notice of Appeal and Request for Discovery, dated June 9, 2010.

44.    The Notice of Appeal contained a discovery demand for materials relevant to the instant appeal that were solely in the possession of the United States Coast Guard. *See id.* The Coast Guard has failed to respond to these discovery demands, and has also failed to provide documents requested pursuant to Freedom of Information Act ("FOIA") requests served on the Coast Guard on June 28, 2010. As more fully described herein, the Coast Guard failed to comply with its discovery and FOIA obligations, in order to conceal and keep from Plaintiffs exculpatory information and evidence that conclusively established there was no factual basis to allege the M/T WILMINA ever violated the PWSA, the Act to Prevent Pollution from Ships or MARPOL.

45.    On August 25, 2010, a Joint Appeal of the Coast Guard Orders was filed with the Coast Guard Assistant Commandant for Marine Safety, Security, and Stewardship and the Commander of the Eighth Coast Guard District. *See* Exhibit 3.

46.    In the Joint Appeal, the Plaintiffs requested that the Coast Guard Orders be vacated as the PWSA provided no legal basis to summarily ban the M/T WILMINA from U.S. ports or to preclude the vessel from obtaining a Certificate Compliance examination for a period of three (3) years.

47.    As set forth more fully in the Joint Appeal, which is attached hereto as part of Exhibit 3, under the PWSA, civil penalties are limited to the imposition of a fine, which can only be imposed after the Coast Guard provides a notice of violation and holds a hearing before a Hearing Officer at which the owner and technical manager of a vessel are given the opportunity to challenge the charges against them, receive evidence from the government supporting any allegations of wrongdoing, present evidence and witnesses in their defense, cross-examine the government witnesses, and contest evidence.

48.    The right to a fair and impartial hearing is not only required by the PWSA, but is a fundamental, constitutionally protected right of due process that is required in any matter where the governmental agency assesses a substantial penalty or deprives a person of property and/or the right to engage in international commerce, as the U.S. Coast Guard has done in this case. No such opportunity was accorded the Plaintiffs in this case.

49.    The Joint Appeal further established that the Coast Guard had arbitrarily, and without just cause, disregarded its own factual findings, as well as the findings of numerous independent third parties, including the vessel's Classification Society, DNV,

the Netherlands Shipping Inspectorate and Oil Companies International Marine Forum's (hereinafter "OCIMF"), all of which, at the relevant times, found the M/T WILMINA to be in full compliance with all U.S. and international marine safety and environmental laws and regulations.

50.     The Coast Guard unilaterally treated this Joint Appeal as a "Request for Reconsideration", and referred it back to the Commander of the Coast Guard Sector Corpus Christi.

51.     On November 19, 2010, the Commander of the Coast Guard Sector Corpus Christi denied the Joint Appeal, and asserted the PWSA permitted the Coast Guard to summarily ban a vessel from calling U.S. waters for a period of three (3) years, without conducting a hearing or providing the owner or technical manager of the vessel with notice of that banning order would be issued or with an opportunity to be heard. *See* Exhibit 4.

52.     On December 9, 2010, the Plaintiffs' filed an appeal of the Sector Commander's decision with the Commander of the Eighth Coast Guard District.  See Exhibit 3.

53.     This Appeal requested that the Coast Guard Orders be vacated as: (1) the M/T WILMINA was never a threat to the U.S. marine environment; (2) the PWSA provided no legal authority for the issuance of the Coast Guard Orders; and, (3) the Coast Guard failed to comply with basic constitutionally and statutorily mandated requirements of due process before it issued the Coast Guard Orders. *See id.*

54.     On February 11, 2011, the Eighth District Commander issued a decision denying the Joint Appeal. *See* Exhibit 4.

55.     On March 1, 2011, the Plaintiffs filed an appeal of the Eighth District Commander's decision with the Coast Guard Atlantic Area Commander. *See* Exhibit 3.

56.     This Appeal to the Coast Guard Atlantic Area Commander: (1) challenged the Coast Guard's repeated failures to abide by the discovery disclosure requirements set forth in 33 C.F.R. § 160.7; (2) highlighted the complete lack of a legal basis to impose a three-year ban pursuant to the PWSA; (3) corrected a number of misstatements of fact regarding the Master and Chief Engineer's alleged lack of knowledge of the vessel's safety management system; and, (4) summarized the overwhelming objective evidence that refuted any claim that the vessel was a threat to the U.S. marine environment. *See id.*

57.     On April 8, 2011, the Coast Guard Atlantic Area Commander issued a decision which summarily denied the appeal of the Eighth Coast Guard Commander's decision. *See* Exhibit 4.

58.     On April 27, 2011, the Plaintiffs appealed the Atlantic Area Commander's decision to the Coast Guard's Assistant Commandant for Prevention. *See* Exhibit 3.

59.     Prior to filing this Appeal, by letter dated March 16, 2011, the Plaintiffs received limited discovery in a separate Civil Penalty Action that was commenced by the Coast Guard Hearing Office related to the M/T WILMINA's call at Corpus Christi in May 2010. Included in these materials were copies of the Coast Guard's Enforcement Summary for the M/T WILMINA investigation, a written statement of one of the USCG investigators, Chief Warrant Officer Christopher Eckard, a Coast Guard laboratory analysis report, and a CD containing copies of "mock up" videos that were provided to the Coast Guard by Robert Pabillar. These documents and materials are more fully discussed below.

16

60.     Despite being in possession of these documents and materials since May 2010, and in complete disregard of its obligations to provide Plaintiffs with copies of the materials pursuant to 33 C.F.R. § 160.7 and the FOIA, the Coast Guard intentionally and purposefully withheld these exculpatory materials, which precluded their use by Plaintiffs during the first three stages of the administrative appeals process.

61.     As more fully set forth in the Appeal of the Atlantic Area Commander's Decision and herein, based on the limited materials produced by the Coast Guard, it was clear that there was never any factual basis for the issuance of the Coast Guard Orders, and the Coast Guard intentionally ignored and thereafter withheld exculpatory evidence, which demonstrated its entire investigation was biased, partial and based on the allegations of a disgruntled former employee who fabricated evidence in an self admitted attempt to get even with his former employer and collect a reward.

62.     On November 1, 2011, after delaying the issuance of a decision on the Plaintiffs' final administrative appeal for more than six (6) months, the Assistant Commandant for Prevention denied the Joint Appeal and issued the Coast Guard's final agency action. *See* Exhibit 4.

## BASIS FOR CHALLENGE

### The Coast Guard Orders Were Issued in Violation of the Procedures Set Forth in the PWSA and Violated the Plaintiffs' Constitutionally Protected Right to Due Process

63.     The Coast Guard Orders both asserted the PWSA empowered the Coast Guard to ban the M/T WILMINA from calling the U.S. for a period of three (3) years on the mere allegation that the vessel violated provisions of MARPOL and the Act to Prevent Pollution from Ships ("APPS"). *See* Exhibits 1 and 2.  However, there is no

17

authority for the imposition of such a draconian and disproportionate penalty under the PWSA. *See* 33 U.S.C. § 1228(a)[12]; 33 U.S.C. § 1223(b)[13].

64.    The PWSA does not empower the Coast Guard to arbitrarily issue an *ex parte* blanket ban and prohibition of the vessel from the navigable waters of the United States for multiple years on the mere allegation of misconduct. *See id.*; *see also Patentas v. United States*, 687 F.2d 707, 712 (3d Cir. 1982) (holding that penalties for violations of the PWSA must be imposed pursuant to the civil and criminal penalty procedural provisions of the PWSA).

65.    The PWSA authorizes the Coast Guard to exercise temporary powers to address <u>emergencies</u> (*i.e.*, an imminent threat to the U.S. marine environment), or to immediately deal with vessels being operated in a hazardous[14] manner. *See id.*; *see also*

---

12 "No vessel , subject to the provisions of chapter 37 of title 46, shall operate in the navigable waters of the United States or transfer cargo or residue in any port or place under the jurisdiction of the United States, if such vessel - (1) has a history of accidents, pollution incidents, or serious repair problems which, as determined by the Secretary, creates reason to believe that such vessel may be unsafe or may create a threat to the marine environment; or (2) fails to comply with any applicable regulation issued under this chapter, chapter 37 of title 46, or under any other applicable law or treaty; or (3) discharges oil or hazardous material in violation of any law of the United States or in a manner or quantities inconsistent with the provisions of any treaty to which the United States is a party; or (4) does not comply with any applicable vessel traffic service requirements; or (5) is manned by one or more officers who are licensed by a certificating state which the Secretary has determined, pursuant to section 9101 of title 46, does not have standards for licensing and certification of seafarers which are comparable to or more stringent than United States standards or international standards which are accepted by the United States; or (6) is not manned in compliance with manning levels as determined by the Secretary to be necessary to insure the safe navigation of the vessel; or (7) while underway, does not have at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English." 33 U.S.C. § 1228(a).
13 "The Secretary may order any vessel, in a port or place subject to the jurisdiction of the United States or in the navigable waters of the United States, to operate or anchor in a manner he directs if - (1) he has reasonable cause to believe such vessel does not comply with any regulation issued under this chapter or any other applicable law or treaty; (2) he determines that such vessel does not satisfy the conditions for port entry set forth in section 1228 of this title; or (3) by reason of weather, visibility, sea conditions, port congestion, other hazardous circumstances, or the condition of such vessel, he is satisfied that such directive is justified in the interest of safety." *See* 33 U.S.C. § 1223(b).
14 "Hazardous condition means any condition that may adversely affect the safety of any vessel, bridge, structure, or shore area or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve collision, allision, fire, explosion, grounding, leaking, damage, injury or illness of a person aboard, or manning-shortage." 33 C.F.R. § 160.204.

33 C.F.R. § 160.113[15]; *see also Llamera v. United States*, 15 Cl. Ct. 593, 597 (Ct. Cl. 1988) (stating the PWSA authorized the Coast Guard to order a vessel to an anchorage pending correction of deficiencies); *Chronos Shipping v. USCG*, 957 F. Supp. 667, 669 (E.D. Pa. 1997) (upholding the imposition of a civil penalty for a violation of the PWSA, as the vessel was carrying crude oil and had failed to report a crack in a cargo tank that created, "a serious threat to the environmental quality of the waterways"). As certified by the Coast Guard through the issuance of a Certificate of Compliance on May 4, 2010, the M/T WILMINA never presented a threat to the U.S. marine environment.

66.     The PWSA is clear that a civil penalty can only be imposed after the Coast Guard provides notice of an alleged violation and a hearing is held where the accused is given an opportunity to challenge and refute the allegations made by the Coast Guard, as well as present witnesses and evidence in its defense. *See* 33 U.S.C. § 1232.[16]

---

15 "(a) Each District Commander or Captain of the Port may prohibit any vessel … from operating in the navigable waters of the United States, or from transferring cargo or residue in any port or place under the jurisdiction of the United States, and within the district or zone of that District Commander or Captain of the Port, if the District Commander or the Captain of the Port determines that the vessel's history of accidents, pollution incidents, or serious repair problems creates reason to believe that the vessel may be unsafe or pose a threat to the marine environment. (b) The authority to issue orders prohibiting operation of the vessels or transfer of cargo or residue under paragraph (a) of this section also applies if the vessel: (1) Fails to comply with any applicable regulation; (2) Discharges oil or hazardous material in violation of any law or treaty of the United States; (3) Does not comply with applicable vessel traffic service requirements; (4) While underway, does not have at least one deck officer on the navigation bridge who is capable of communicating in the English language." 33 C.F.R. § 160.113.

16 "(1) Any person who is found by the Secretary, after notice and an opportunity for a hearing, to have violated this chapter or a regulation issued hereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation. Each day of a continuing violation shall constitute a separate violation. The amount of such civil penalty shall be assessed by the Secretary, or his designee, by written notice. In determining the amount of such penalty, the Secretary shall take into account the nature, circumstances, extent and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require. (2) The Secretary may compromise, modify, or remit, with or without conditions, any civil penalty which is subject to imposition or which has been imposed under this section. (3) If any person fails to pay an assessment of a civil penalty after it has become final, the Secretary may refer the matter to the Attorney General of the United States, for collection in any appropriate district court of the United States." 33 U.S.C. § 1232(a).

67.     The PWSA is also clear that a penalty for a violation of the Act can only be imposed if the Coast Guard sustains its burden and proves its allegations at the hearing. *See id.* Even when a violation of the PWSA is found after a hearing, the only penalty that can be imposed for this violation is a fine. *See id.*

68.     The Coast Guard never provided notice that an alleged violation of the PWSA had occurred prior to issuing the Coast Guard Orders, and no hearing regarding an alleged violation of the PWSA has ever been held. Not only did this failure to conduct an impartial hearing violate the provisions of the PWSA, it also violated the Plaintiffs' constitutionally protected due process rights.

69.     The Fifth Amendment's due process clause[17] precludes any governmental agency from imposing penalties on a party without first establishing that party has violated the law. *See Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168 (1951) ("the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a basic principle to our society."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 175 (1962) ("punishment would be a very grave one if the act does in reality impose pains and penalties before and without a conviction by due process of law.").

70.     Due process within the meaning of the Fifth Amendment requires that a legal person have "...an opportunity to be heard *at a meaningful time and in a meaningful manner*." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)(emphasis added). The purpose of this requirement is not only to ensure abstract fair play to any party, but to

---

17 "No person shall be . . . deprived of life, liberty, or property, without due process of law. . ." Fifth Amendment, U.S. Constitution. For over a century, it has been well settled law that, "corporations are persons within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law." *Covington & Lexington Turnpike Co. v. Sandford*, 164 U.S. 578, 592 (1896).

minimize substantively unfair or mistaken deprivations of property or other protected interests. *See Fuentes v. Shevin*, 407 U.S. 67, 80-81 (1972).

71.     The *ex parte* issuance of the Coast Guard Orders, which precluded the M/T WILMINA from calling the United States for three (3) years is a flagrant and impermissible violation of the constitutionally protected principle of due process and the provisions of the PWSA.

### There is No Factual Basis For the Coast Guard Orders And The Objective Evidence Establishes The M/T WILMINA Was Never A Threat To the U.S. Marine Environment.

72.     The Coast Guard has arbitrarily, capriciously and without just cause disregarded its own factual findings, as well as the findings of numerous independent third parties, including DNV, the vessel's Classification Society, Netherlands Shipping Inspectorate and oil majors that utilized the OCIMF's SIRE inspection system, all of which found the M/T WILMINA to be in full compliance with all U.S. and international marine safety and environmental laws and regulations.

73.     Rather than credit this objective evidence, the Coast Guard gave full faith and credit to demonstrably false allegations of Robert Pabillar and the crewmember he extorted, Cesar Cruz.

### The Coast Guard's Investigation Depended Completely On Crediting the Whistleblowers' Allegations

74.     Pabillar and Cruz are fundamentally and patently unreliable witnesses, as: (1) Pabillar admitted he was reporting allegations of misconduct because he had been terminated for cause and wanted to "get even with the Company" and to collect a reward; (2) Pabillar was  indicted for the importation and possession of child pornography; (3) Pabillar extorted Cesar Cruz to support his allegations by threatening to show to Cruz's

wife numerous sexually explicit photographs of Cruz with underage girls; (4) Pabillar and Cruz fabricated evidence in an attempt to corroborate their false and completely baseless allegations of misconduct; and, (5) the physical evidence demonstrates that Pabillar and Cruz planted evidence in an attempt to corroborate their claims.

75.     From its first interview of Pabillar, the Coast Guard was well aware that Pabillar was motivated to make his false claim by personal animus against the Plaintiffs, as they terminated his employment for cause, upon recommendation of Pabillar's shipmates.

76.     Pabillar joined the M/T WILMINA on March 11, 2010, and was working as a Fitter on a probationary basis. On March 31, 2010, Pabillar was given notice that he was not performing his job in an adequate manner; that he did not possess the skill, experience or level of knowledge expected of a Fitter; and that there was no indication that he could or would improve to reach a basic level of competence. *See* Exhibit 20, Letter of Warning, dated March 31, 2010.

77.     After issuance of the written warning, a Hearing Board was convened aboard the vessel, which was comprised of the Chief Engineer, Chief Officer, First Engineer, Third Officer, Cook and an Able Seaman, representing Filipino and non-Filipino races. *See* Exhibit 21, Board Hearing Statement, dated March 31, 2010.

78.     The members of the Hearing Board determined that Pabillar was incompetent and unprofessional. *See id.*

79.     In response, Pabillar submitted a written statement in which he admitted he had performed in a sub-standard manner, but claimed that he was being disciplined only because of his Filipino race. *See* Exhibit 22, Pabillar Statement, dated April 4, 2010.

80.     On April 8, 2010, the Master issued Pabillar a Notice of Dismissal and advised him he would be repatriated at the next port, Murmansk, Russia. *See* Exhibit 6, Notice of Dismissal of Robert Pabillar, dated April 8, 2010.   Due to visa restrictions at Murmansk, Pabillar could not be discharged at this port and instead rode the vessel to Corpus Christi.

81.     When he was interviewed by the Coast Guard on May 5, 2010, Pabillar freely admitted that he was reporting the alleged improper discharge of bilge waste so he could "make the company pay" for his dismissal. Furthermore, Pabillar acknowledged during this interview that he was aware that he would be eligible for a financial reward if the company was assessed a fine for a violation of the Act to Prevent Pollution from Ships.

82.     Despite the fact that Pabillar was clearly motivated by personal animus towards his former employers and the prospect of receiving a large monetary reward, the Coast Guard credited his allegations and ignored all objective exculpatory evidence that refuted Pabillar's allegations of misconduct, including their own comprehensive examination of the vessel's pollution control equipment and records, only the day before.

83.     Similarly, before issuing the Coast Guard Orders, the Coast Guard was fully aware that its primary witness, Pabillar, had been arrested for the possession and importation of child pornography, a video entitled "The Virgin!.3gp", which depicted, "a minor female engaged in sexually explicit conduct to include the lascivious exhibition of the genitals and pubic area, as well as sexual intercourse, specifically vaginal penetration by an adult male penis." *See* Exhibit 16, *United States v. Pabillar*, S.D. Texas Index No. 2:10-cr-623, at p. 4.

84.     Prior to Pabillar's arrest, the Department of Justice had commenced an investigation of the M/T WILMINA. However, this investigation was immediately terminated when the Department of Justice washed its hands of Pabillar. No doubt part of the basis of the Department of Justice's decision was its unwillingness to continue an investigation that was based on the allegations of an individual they would be prosecuting for the possession and importation of child pornography. However, the Coast Guard completely disregarded these concerns and, through the issuance of the Coast Guard Orders, arbitrarily, capriciously and without due process, imposed an *ultra vires* penalty despite the fact that it knew its star witness is a pedophile.

85.     Prior to issuing the Coast Guard Orders, the Coast Guard was also aware that Motorman Cesar Cruz supported Pabillar's claim because he had been extorted by Pabillar.

86.     The M/T WILMINA's First Assistant Engineer, Kaluzinski Waldemar, and the vessel's Second Assistant Engineer, Mariusz Dolega, have given sworn declarations that state Cesar Cruz admitted to them that Robert Pabillar had obtained copies of images that showed Cruz in sexually explicit situations with numerous women, other than his wife, and that Pabillar used these images to force Cruz to support Pabillar's allegations of improper discharges from the M/T WILMINA. *See* Exhibits 10-11.

87.     The former steward of the M/T WILMINA, Ryszard Stosik, has also provided a sworn declaration that states that he saw pictures of Cruz with numerous "young naked Asian girls," on a computer that was available for crewmember use. *See* Exhibit 12.

88.     When a forensic examination of this computer was performed, over six hundred images of Cruz in sexually explicit situations with multiple women were recovered. *See* Exhibit 23, Declaration of LogicForce. The recovery of these images from the vessel's computers established that Pabillar had access to images that could jeopardize Cruz's marriage if they were provided to his wife, as Pabillar threatened Cruz he would do if Cruz did not support Pabillar's statements to the Coast Guard.

89.     Under these circumstances, Pabillar had the power to, and did, coerce Cruz to support the false allegations by threatening to expose Cruz's adultery and possible patronage of underage women to his wife or to the authorities.  As such, the allegations of Cruz must be questioned and Pabillar's extortion of his shipmate must be considered before placing any weight on the allegations made by Pabillar.

90.     During the course of the administrative appeal, the Coast Guard repeatedly asserted that videos taken by Pabillar and Cruz corroborate their allegations and establish that an improper discharge of bilge waste occurred on the M/T WILMINA.

91.     Pabillar and Cruz admitted to the Coast Guard that these videos did not actually show an illegal discharge, but were merely a "mock-up" of how the alleged bypass hose would have been connected if an illegal discharge had taken place. Pabillar and Cruz openly admitted to the Coast Guard that they staged the event depicted in the videos.

92.     Coast Guard Activity Summary Report No. 3814981 states that when Pabillar and Cruz were interviewed on May 5, 2010, they both told the Coast Guard that they created the two videos on April 24, 2010, when the M/T WILMINA was allegedly

off the coast of Bermuda. *See* Exhibit 24, Coast Guard Activity Summary Report No. 3814981.

93.     USCG Chief Warrant Officer Eckard also confirmed in his witness statement that the Pabillar and Cruz alleged the videos were made off the coast of Bermuda on April 24, 2010. *See* Exhibit 25, written statement of CWO Eckard.

94.     When the Coast Guard inspectors attempted to verify this claim by charting the vessel's position on April 24, 2010, they realized that the vessel was not off the coast of Bermuda, but rather, was approximately five hundred (500) miles east of Newfoundland, and over fifteen hundred (1,500) miles from Bermuda. In fact, the vessel was not near Bermuda for another five (5) days (*i.e.*, April 29, 2010). *See* Exhibit 24; *see also* Exhibit 25.

95.     Rather than confront Pabillar and Cruz to ascertain why they both lied to the Coast Guard when they claimed the vessel was near Bermuda on April 24, 2010, CWO Eckard, on his own volition, decided to change the date of the alleged discharge provided by Pabillar and Cruz to April 29, 2010, when the vessel was near Bermuda, instead of April 24, 2010, as reported by Pabillar and Cruz. *See id.* This is the paramount example of the biased, partial, unfair and faulty investigation undertaken by the Coast Guard, which formed the basis for the Coast Guard Orders.  An impartial and independent investigator would have been deeply concerned that his only two "witnesses" who alleged firsthand knowledge of unlawful activity, gave conflicting and improbable critical details, such as the very recent date on which they created their key piece of video evidence.

96.     The five (5) day inconsistency of the dates is particularly troubling as the alleged event in question supposedly occurred mere days before these witnesses were interviewed. Rather than provide support for the whistleblowers' allegations, a qualified and open minded law enforcement officer would have realized the witnesses had so "practiced" their story that they had incorporated the same lies regarding the timing and location of the critical event that gave rise to the entire investigation and ultimate conclusions reached.

97.     Instead of disregarding or further investigating the factually improbable allegations being made by Pabillar and Cruz, the Coast Guard reworked the account of events provided by Pabillar and Cruz, by changing the date of the "mock up" video was taken from April 24, 2010 to April 29, 2011, in an improper attempt to ensure it no longer materially conflicted with objective evidence such as the bridge log, and the vessel's oil record book with recorded the use of the OWS on April 26, 2010.[18]

98.     Beyond arbitrarily and improperly altering the date of when the "mock up" videos were taken, the Coast Guard failed to follow its own evidence collection procedures, which has denied Plaintiffs any ability to utilize the videos to establish the allegations of misconduct are false.

99.     The Coast Guard did not seize and voucher as evidence the original flash drive that Pabillar provided.   Instead, in violation of the Coast Guard's written

---

18 As set forth in the vessel's oil record book, on April 26, 2010, the OWS was utilized to discharge 18 m3 (approximately 4755 gallons) of bilge water overboard, through this overboard discharge valve. Thereafter, the OWS was secured and no bilge waste was discharged prior to the vessel's arrival in Corpus Christi on May 4, 2010. Therefore, the only possible explanation for the presence of oil, (oil which did not originate from any of the vessel's waste oil holding tanks, as confirmed by the Coast Guard's own laboratory as set forth below), in the overboard discharge valve is that this oil was planted in the valve by the whistleblowers in an attempt to corroborate their allegations.

investigative procedures, the Coast Guard investigators copied the videos contained on the flash drive and returned the flash drive itself to Pabillar.

100.   The failure to preserve the original evidence violated the Coast Guard's policies, which provide, in part, that, "it is critical that all marine investigators (including pollution investigators) conduct their investigations in a fashion that will preserve the evidence and facts for use in a criminal setting." *See* Chapter C-7-C.1 of the Coast Guard's Marine Safety Manual, Volume V: Investigations and Enforcement - M16000.10A. Furthermore, Chapter 3(f) of the Coast Guard's Criminal Enforcement of Environmental Laws - M16201.1, states, "when evidence is being collected to support civil or criminal charges, it is important to maintain a continuous chain of custody from the time the evidence is collected until it is analyzed. . . **All original evidence should be secured in a locked evidence locker (locked refrigerator for oil) until transfer/disposition instructions are received from the prosecutor.** Access to, and the release of, evidence from the evidence locker should be controlled by a single individual who should maintain a log recording evidence received and evidence released." (Emphasis added).

101.   There is a fundamental and material conflict between the account given be Pabillar and Cruz (i.e., that the "mock up" videos were taken on April 24, 2010), and the Coast Guard's inexplicable and improper account regarding when the "mock up" videos were taken (i.e., that the "mock up" videos were taken on April 29, 2011), and the Coast Guard's failure to seize the original "mock up" videos which has precluded a forensic analysis that would resolve this conflict. This denied Plaintiffs' access to critical

exculpatory evidence that would refute the allegations of misconduct and cast serious doubt on the Coast Guard's version of events.

102.    In addition to the arbitrary and capricious manner the Coast Guard handled its "investigation", a review of the objective evidence refutes any claimed factual basis for the Coast Guard Orders.

### Findings Made By the Coast Guard's Laboratory Conclusively Establish the Vessel Never Improperly Discharged Bilge Waste Overboard

103.    In his witness statement, CWO Eckard stated that during the course of the expanded MARPOL exam, the Coast Guard opened the bonnet of the overboard discharge valve and, "oil sprayed out of the valve" and onto the hull of the vessel. *See* Exhibit 25.

104.    In its responses to the administrative appeals, the Coast Guard cited the presence of oil in the overboard discharge valve as a critical piece of corroborating evidence. However, the Coast Guard failed to divulge and acknowledge that this oil was tested by the Coast Guard's own laboratory, and the Coast Guard's laboratory concluded that the oil found in this overboard discharge valve and the alleged bypass hose (hereinafter "the overboard samples"), did not originate from any of the vessel's waste oil holding tanks.

105.    Specifically, on May 7, 2010, Coast Guard personnel collected a number of oil samples from the M/T WILMINA's engine room bilge and slop tanks (waste oil holding tanks) (hereinafter "the source samples"), and sent them to the Coast Guard Marine Safety Laboratory at Groton, Connecticut, to compare with samples that Coast Guard personnel had previously collected from the vessel's overboard discharge valve,

piping, and the alleged "bypass hose". *See* Exhibit 26, Coast Guard Marine Safety Laboratory Report. The Coast Guard divided the samples into two groups. *See id.*

106.     When the Coast Guard Laboratory compared the two groups of samples, it unequivocally found **no match** between the source samples and the overboard samples. *See id.* Specifically, the Coast Guard Laboratory found that overboard sample no. 1, the alleged "bypass hose", and the other overboard samples, nos. 4, 6, 7, and 8, were derived from a "common source of petroleum" other than the oily waste in the vessel's bilge and sludge tanks. *See id.* When the overboard samples were compared to the source samples, the Coast Guard concluded that the contents of the vessel's bilge and sludge holding tanks were **not** the "common source" of this petroleum.

107.     The Coast Guard Laboratory's report was issued on May 10, 2010, eleven (11) days before the first banning order was issued. *See* Exhibit 26; *see also* Exhibit 1. The Coast Guard was therefore fully aware, prior to the issuance of the Coast Guard Orders, that the Coast Guard's own laboratory had determined that the physical evidence refuted any claim that the vessel ever improperly discharged bilge waste. Rather than credit this objective, exculpatory evidence, and conduct a more thorough examination of the allegations made by the whistleblowers, the Coast Guard arbitrarily and capriciously ignored these findings

108.     As the Coast Guard found that the alleged oil in the discharge lines from the ship did not come from the vessel's engine room, the only reasonable conclusion one can draw is that Pabillar and Cruz placed oil in the discharge lines to support their claims, in hopes of making the company "pay" and collecting a whistleblower reward.

109. The Coast Guard's own laboratory established that the oil found in the overboard discharge valve and flexible hose is actually exculpatory and refutes any claim that the vessel improperly discharged bilge waste. Not only was this laboratory report concealed and withheld from the Plaintiffs until March 2011, but the Coast Guard ignored its finding when it issued the Coast Guard Orders and its final agency action which upheld these orders.

### The Vessel's Pollution Control Equipment Was Tested Numerous Times and Functioned Properly

110. The Coast Guard final agency action dated November 1, 2011 states that during the expanded MARPOL examination the Coast Guard inspectors determined that neither the OWS nor incinerator functioned properly. The statement is patently false.

111. On May 4, 2010, the Coast Guard issued a Certificate of Compliance ("COC") examination which certified that M/T WILMINA was in full compliance with all applicable U.S. marine safety and environmental regulations.

112. In conducting the COC examination, the Coast Guard inspectors were required to follow the procedures set forth in the Coast Guard's USCG Foreign Tank Vessel Examination Book, including operational tests of the vessel's OWS and incinerator.

113. The incinerator and OWS were tested during the COC examination and were found to be fully functional. In this regard, the PSC report that the Coast Guard issued on May 4, 2010 confirmed that the Coast Guard found no deficiencies related to the OWS or incinerator following the test of this equipment.

114.    In addition to the COC examination, when the Coast Guard re-tested the incinerator on May 6, 2010, the inspectors found it to be fully functional. This conclusively refuted any claim that the incinerator was not functioning properly.

115.    Regarding the OWS, the Coast Guard final agency action dated November 1, 2011, states that the (successful) test of the OWS on May 4, 2010 must be disregarded because this test was not "an operational test," but instead a test of the oil content meter, which is a component of the OWS to measure the content of oil in the discharged water. This assertion is at odds with the Coast Guard's own Foreign Tank Vessel Examination Book, which requires Coast Guard personnel to have performed a comprehensive examination of the OWS, including a fifteen to twenty minute operational test of OWS, to ensure the vessel was in full compliance with all applicable U.S. and International marine environmental regulations, prior to issuing the Certificate of Compliance, which was issued on May 4, 2010.

116.    After the OWS test was first (successfully) performed during on May 4, 2010, the Coast Guard inspectors ordered the vessel's crewmembers to remove the Oil Content Meter ("OCM") from the OWS so the Coast Guard could search the internal memory of the OCM. However, as the Coast Guard was told repeatedly at the time, the OCM did not contain an internal memory that could be searched.

117.    In the Coast Guard final agency action dated November 1, 2011, the Coast Guard asserted, without any evidence, that prior to removing the OCM from the OWS, the OWS was retested and it failed this test. This assertion is completely false, and there are several witnesses, who can confirm that the OWS was successfully tested prior to the removal of the OCM at the Coast Guard's request.

118.    Following the removal of the OCM, the Coast Guard was in exclusive possession and control of the OCM for more than twenty-four hours. Thereafter, on May 6, 2010, the Coast Guard ordered the vessel's crew to reinstall the OCM. As none of the crewmembers were trained OWS technicians, they encountered difficulties in reconnecting all OCM electrical power and control connections. Once the OCM was reinstalled, incorrectly by untrained crewmembers, the OWS was tested and, of course, malfunctioned. This was the first time the OWS was tested since the initial, successful, test of the OWS on May 4, 2010.

119.    When an OWS technician attended the vessel on May 7, 2010, he confirmed that the malfunction that occurred on May 6, 2010 was the result of the crew misconnecting several electrical connections between the OCM and the OWS.

120.    After restoring the proper electrical connections, in the presence of the Coast Guard, the OWS technician tested the OWS and it again functioned properly. Thereafter, the Coast Guard inspectors also witnessed a test of the OCM with calibrating liquid which confirmed the OCM was capable of exactly detecting the parts per million ("ppm") content of the sample effluent. The exacting standards of this calibration test refute any assertion that the OWS and/or the OCM were not functioning properly.

121.    In its final agency action dated November 1, 2011, the Coast Guard failed to acknowledge this May 7, 2010 test of the OWS, and the Coast Guard's own role in disabling the OWS prior to the May 6, 2011 test.

122.    As was established by the numerous tests of the OWS and incinerator between May 4, 2011 and May 7, 2011, the vessel's pollution control equipment was functioning properly at all times.

### THE VESSEL'S PROVEN HISTORY OF COMPLIANCE

123.    The Coast Guard Orders asserted the M/T WILMINA was not operated in compliance with U.S. and International marine safety and environmental laws when it called Corpus Christi, Texas, in May 2010. However, the Coast Guard's own inspections of the vessel on May 4, 2010 and on previous occasions, as well as the empirical evidence shows that the Coast Guard's assertions in the banning Orders are false, arbitrary and capricious. The vessel was, at all times, in full compliance with all relevant laws and regulations.

124.    On November 27, 2009, the M/T WILMINA underwent a Port State Control inspection in Corpus Christi, Texas, conducted under the leadership of LTJG Simser, the same officer that was in command of the May 4, 2010 inspections. *See* Exhibit 27, Port State Control Report, dated November 27, 2009. The Coast Guard performed that November 2009 inspection prior to the vessel reaching a berth in Corpus Christi, as the Coast Guard deemed it a "priority" inspection. *See id.*

125.    For this "priority" inspection, the Coast Guard's Boarding Procedures required Coast Guard personnel to conduct a thorough examination of the vessel, including an evaluation of the vessel's: (1) ability store and dispose of its bilge water and oily waste; (2) compliance with the requirements of its Safety Management System; and, (3) ability to demonstrate its pollution control equipment, including the incinerator and oily water separator was functioning properly. *See* Exhibit 28, USCG NVIC 06-03 Change 2, Enclosure 3 (Boarding Procedures).

126.    After completing the November 27, 2009 priority Port State Control Inspection, the Coast Guard found no deficiencies and LTJG Simser specifically stated in

her report: **"Ship in Excellent Condition and Crew Well Trained"**. *See* Exhibit 27. (Emphasis added).

127.    The Coast Guard's findings of November 27, 2009, were confirmed by the Netherlands Shipping Inspectorate in Rotterdam on April 6, 2010, which conducted its own Port State Control inspection of the vessel. *See* Exhibit 29, Report of Inspection, dated April 6, 2010. This examination of the vessel, which included an inspection of the engine room, found no deficiencies. *See id.* The vessel was found to be in compliance with all applicable marine safety and environmental regulations. *See id.*

128.    On May 4, 2010, Port State Control Officer LTJG Simser conducted her second Port State Control Examination of the M/T WILMINA, and once again found the vessel was fully compliant with all U.S. and International marine safety and environmental regulations. *See* Exhibit 7, Port State Control Report, dated May 4, 2010; *see also* Exhibit 8, Certificate of Compliance, dated May 4, 2010.

129.    According to the Coast Guard's Foreign Tank Vessel Examination Book, LTJG Simser's boarding team was required to examine the M/T WILMINA's oil record book to ensure the entries concerning the collection and disposal of oil residues were correct, the entries involving the use of the OWS matched the capability of the OWS as set forth in the vessel's IOPP certificate, and to ascertain if there was any evidence of false entries in the oil record book. *See* Exhibit 9, at p. 16.

130.    As part of the COC inspection, the Coast Guard was further required to examine the vessel's SMS manual and records to ensure it included a comprehensive

safety and environmental policy[19], an effective maintenance program and that crewmembers and Master were familiar with the policies set forth in the SMS and were implementing the same. *See id.* at p. 21 – 22 (emphasis added).

131.   The Coast Guard was also required to question the vessel's crew regarding, "how much oil/sludge the incinerator burns" and confirm this was in accordance with the rated capacity of the incinerator as set forth in the vessel's International Oil Pollution Prevention Certificate. *See id.* at p. 47.

132.   The Coast Guard was required to test the oily water separator and the oil content meter to verify the system could be utilized to discharge bilge water with an oil content below 15 ppm, to ascertain that that there were no signs of any tampering or bypassing of the oily water separator or oil content meter, and that the vessel had the recommended spare parts and filter materials on board the vessel. *See id.* at p. 48 – 50. After examining the vessel in accordance with the requirements set forth above, the Coast Guard certified that the vessel was, **"found to be in compliance with all applicable U.S. and international marine safety and environmental protection standards."** *See* Exhibit 8, Certificate of Compliance, dated May 4, 2010 (emphasis added).

133.   This finding accurately stated the condition of the vessel on May 4, 2010, as the vessel was, in fact, in excellent condition and fully compliant with all environmental laws and regulations and all Class and Flag requirements.[20]

---

19 By conducting the required examination of the vessel's SMS manual, the Coast Guard should have been able to confirm that the vessel was utilizing a comprehensive environmental compliance program that was put in place by the vessel's technical manager, Plaintiff Wilhelmsen Marine Services AS, in 2008.
20 In issuing the two Orders on the basis of Pabillar's and Cruz's false allegations, the Coast Guard appears to be completely disavowing the findings of its trained personnel and the published results of the COC examination.

134.    Prior to the May 4, 2010 inspection, the vessel had been regularly examined by internal auditors and the vessel's classification society, DNV.

135.    In January 2008, DNV attended the vessel in Saint Lucia to perform an ISM certification. *See* Exhibit 30, DNV Survey Report, dated January 20, 2008 (finding no major non-conformities onboard the vessel). In September 2008, DNV performed an audit and certified the vessel's ISM procedures. *See* Exhibit 31, DNV Survey Report, dated September 11, 2008 (performing Safety and Oil Pollution Prevention audit and survey and finding no deficiencies). In January 2009, DNV performed an ISPS renewal audit. *See* Exhibit 32, DNV Survey Report, dated January 19, 2009 (finding no non-conformities and confirming the ISPS was well implemented on the M/T WILMINA).

136.    In addition, in August 2009 the vessel underwent a comprehensive internal ISM audit, as part of a continuous annual audit plan in accordance with ISM rules, by the vessel's technical manager, Plaintiff Wilhelmsen Marine Services AS. *See* Exhibit 33, Internal Audit Report, dated August 16-17, 2009.

137.    This audit found the M/T WILMINA was being operated in compliance with the Plaintiff technical manager's Safety Management System (SMS) manuals. *See id.* Specifically, the comprehensive audit examined the vessel's: (1) document and date control practices; (2) compliance with the SMS; (3) compliance with environmental compliance procedures; (4) maintenance and repair policies; (5) inspection records; (6) training records; (7) communication practices; (8) cargo handling practices; and, (9) compliance with safety procedure requirements. *See id.* The vessel and crewmembers were found to be in compliance with all applicable safety, security and environmental compliance practices. *See id.*

138.   All Port State Control inspectors, internal auditors and Classification Society auditors found the M/T WILMINA had fully implemented its SMS and was in full compliance therewith.

139.   In addition, the vessel was subject to a number of independent industry SIRE vetting inspections utilizing the OCIMF SIRE criterion to ensure the vessel was employing the best practices of the marine oil transportation industry to comply with all applicable marine safety and environmental laws and regulations. These vetting inspections are reported to OCIMF's SIRE system which maintains a database of vetting inspection reports, accessible to all OCIMF members.

140.   The M/T WILMINA underwent the following independent SIRE vetting inspections: (1) Repsol Vetting at La Pampilla, Peru on March 11, 2008; (2) StatoilHydro Vetting at Freeport, Texas on October 27, 2008; (3) BP Group Vetting at Quinetro, Chile on February 29, 2009; (4) ConocoPhillip Marine Vetting at Yangpu, China on August 22, 2009; (5) Valero Vetting at Corpus Christi, Texas on January 30, 2010; and, (6) Repsol Vetting at Tarragona, Spain on March 5, 2010. The independent vetting inspectors found not a single non-conformity related to the vessel's pollution control equipment.

141.   Tanker Management Self Assessment (hereinafter "TMSA")[21] is a supplement to SIRE[22] and requires vessel operators to achieve high standards of vessel

---

21 In order to recognize vessel operators, such as Plaintiff Wilhelmsen Marine Services AS, that embrace the spirit of the ISM code and go well beyond fulfilling the minimum ISM requirements, OCIMF created the TMSA. The TMSA program was introduced in 2004 as a tool to help vessel operators assess, measure and improve their management systems. TMSA encourages vessel operators to assess their safety management systems against listed key performance indicators and provides best practice guidance. Best practice is an effective way to minimize the possibility of problems reoccurring. It creates opportunities and optimizes performance in crucial areas such as safety and environmental excellence. Companies that implement TMSA are committed to transferring the best practices across their fleet through the consistent application of improved processes and procedures.

management and continuous improvement, and provides guidance on what OCIMF

believes to be current industry best practices.23 Plaintiff Wilhelmsen Marine Services AS

implemented the TMSA as a best management practice guideline and commenced their

self-assessment scores in 2007. These self assessment scores are sent out at least twice a

year to all oil majors that are members of the OCIMF.

142.     TMSA also leads to long-term delivery of safety and environmental

excellence that complies with all applicable international maritime laws and regulations,

as well as the vessel's own SMS requirements.[24] TMSA permits the vessel's charterers

(*i.e.*, the most of the oil majors) to be confident that vessels such as the M/T WILMINA

are operated at the very highest standards of compliance. Simply put, TMSA goes well

beyond the requirements of ISM to ensure tank vessels are suitable for chartering by oil

majors.

### Damages Caused by Coast Guard Orders

143.     By summarily and arbitrarily banning the M/T WILMINA from U.S.

ports, the Coast Guard's Orders have caused and continue to cause substantial economic

harm and damage to the Plaintiffs. In addition to over $894,730 in expenses incurred

---

22 The SIRE program began in 1993, and is intended to provide a database that allows the maritime tanker community to ascertain whether tank vessels are well managed and maintained.

23 These best practices include a requirement that a detailed examination of the OWS be performed. The examination criteria require the inspector to confirm the OWS piping has not been altered or physically bypassed and the OCM has not been altered. Additionally, the inspector must perform a test of the OWS and OCM, and confirm that all engineering officers are capable of operating the OWS.

24 A copy of a TMSA Self Assessment Report for Wilhelmsen Marine Services AS, dated February 12, 2010, is enclosed herewith as Exhibit 35. The Operator is obliged to send their self assessment to all OCIMF members within twelve (12) month intervals and this report was generated following a comprehensive examination of the following areas: (1) Management, leadership and accountability; (2) Recruitment and management of shore-based personnel; (3) Recruitment and management of vessel personnel; (4) Reliability and maintenance standards; (5) Navigational safety; (6) Cargo, ballast and mooring operations; (7) Management of change; (8) Incident investigation and analysis; (9) Safety management; (10) Environmental management; and, (11) Emergency preparedness and contingency planning.

while the M/T WILMINA was detained in Corpus Christi from May 4, 2010 to May 25, 2010, due to the detention of the vessel, the Plaintiffs were unable to undertake a previously contractually agreed voyage from the East Coast of Mexico to Spain to carry a cargo of crude oil. Completion of this voyage would have generated revenue of at least $809,912. *See id.* In addition to these damages, the inability to call ports in the United States has, to date, caused at least $2,470,000 in damages, as the vessel cannot perform any charter party agreements that require the vessel call at ports in the United States. In addition, the vessel's ability to obtain market rates for charter parties that it can perform has been substantially reduced as a result of the improper banning from US ports causing the Plaintiffs further economic harm and damages.

144.    The Coast Guard has also significantly damaged the heretofore excellent reputation of the Plaintiffs in the maritime tanker shipping community. This damage will take years to repair and has and will, undoubtedly, continue to cause Plaintiffs to lose substantial sums in revenue.

### COUNT 1

### Lack of Statutory Authority and Failure to Provide Plaintiffs with Due Process of Law Prior to Issuance of the Coast Guard Orders

145.    Plaintiffs reallege paragraphs 1 through 144 of this complaint.

146.    The Coast Guard Orders banning the M/T WILMINA from the ports and navigable waters of the United States for three (3) years purported to rely on the PWSA for statutory authority to impose this ban.

147.    The PWSA does not empower the Coast Guard to prohibit a vessel from calling U.S. ports for multiple years on the mere allegation of misconduct. The PWSA authorizes the Coast Guard to exercise *temporary* powers to address emergencies (*i.e.*, an

imminent threat to the U.S. marine environment), or to immediately deal with vessels being operated in a hazardous manner. The M/T WILMINA was never an imminent threat to the U.S. marine environment, nor was it ever operated in a hazardous manner, while in U.S. waters or elsewhere.

148.    No provision in the PWSA authorizes imposition of such a severe and disproportionate penalty as a three-year ban, nor can any penalty be imposed pursuant to the PWSA on an *ex parte*, unilateral basis.

149.    The PWSA is clear that a civil penalty can be imposed only after the Coast Guard provides notice of an alleged violation and a hearing is held where the accused is given an opportunity to challenge and refute the allegations made by the Coast Guard, as well as present witnesses and evidence in its defense. If after providing notice of an alleged violation and carrying its burden at a subsequent hearing, the PWSA limits the penalties that can be imposed to a fine.

150.    These PWSA procedures are in accordance with the Fifth Amendment's due process clause, which precludes any governmental agency from imposing a penalty on a party without first establishing that party has violated the law, after providing notice of the violation and an opportunity to be heard. At its most basic level, due process within the meaning of the Fifth Amendment required that the Plaintiffs be provided with an opportunity to be heard ***at a meaningful time and in a meaningful manner***. The Coast Guard violated the PWSA and the Plaintiffs' constitutional rights when it issued *ex parte* orders, without conducting a hearing or adversarial proceeding, banning the M/T WILMINA from calling the United States for three (3) years.

151.   Had the procedures set forth in the PWSA been properly followed, a hearing would have been held at which it would have been established that there is no factual basis for the Coast Guard's allegations that the M/T WILMINA was or is a threat to the U.S. marine environment.

### Lack of Factual Basis for Issuance of Coast Guard Orders

152.   The Coast Guard Orders asserted, without providing any factual support, that: (1) the M/T WILMINA's oil record book contained "inconsistencies"; (2) the vessel's Oily Water Separator was "inoperable"; (3) there was oil residue found in the overboard discharge piping of the OWS; (4) there was a oily water bypass hose recovered from the vessel; (5) the vessel's Master and Chief Engineer failed to abide by the requirements of the vessel's SMS regarding the reporting of critical equipment casualties; and, (6) the vessel discharged oily water in contravention of MARPOL on several occasions. *See id.*

153.   The objective evidence, more fully set forth in paragraphs 7 through 144, refutes each of these allegations, as: (1) all allegations that the vessel's oil record book was inaccurate are based on incredible witnesses who were either extorted to make these allegations (*i.e.*, Cesar Cruz) or, were motivated by personal animus and an interest in obtaining a financial reward (*i.e.*, Robert Pabillar); (2) the vessel's OWS was successfully tested at the request of the Coast Guard on May 4, 2010 and May 7, 2010, and functioned properly then and at all times prior to the vessel's arrival in Corpus Christi; (3) as established by the Coast Guard's own laboratory, the oil residue found in the overboard discharge piping of the OWS was not bilge waste generated by the vessel, but was oil planted by Pabillar and Cruz to support their false allegations; (4) the objective evidence

is clear that the M/T WILMINA never improperly discharged bilge waste, and the flexible hose recovered by the Coast Guard was fabricated by Pabillar and Cruz to support their false claims of misconduct; (5) as verified by the U.S. Coast Guard, foreign Port State Control authorities, the vessel's technical manager, the vessel's Classification Society and numerous vetting inspectors, the vessel's Master and Chief Engineer were fully aware of and abided by the procedures set forth in the SMS and furthermore there was no need to report any critical equipment casualties, as the vessels OWS and incinerator functioned properly; and, (6) the Coast Guard has failed to produce any credible evidence that the vessel ever illegally discharged bilge waste.

154.   In contrast, the objective, empirical and independent evidence, including the Coast Guard's own Port State Control Inspection reports dated November 27, 2009 and May 4, 2010, confirm the M/T WILMINA was a well maintained and properly operated vessel that was and is fully compliant with all applicable U.S. and international marine safety and environmental regulations.

155.   There is no legal or factual basis for the Coast Guard Orders and therefore, their issuance was "(A) arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."[25]

156.   The issuance of the Coast Guard Orders without providing the Plaintiffs with notice that said orders would be issued and without providing Plaintiffs with an opportunity to be heard, is "(B) contrary to [Plaintiffs'] constitutional right, power, privilege, or immunity;"[26]

---

25 *See* 5 U.S.C. § 706.
26 *See id.*

157.    As the PWSA does not permit the banning of vessels from calling the United States, the Coast Guard Orders were issued "(C) in excess of [the Coast Guard's] statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law;"[27]

158.    The Coast Guard Orders were "(E) unsupported by substantial evidence....; [and] (F) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court."[28]

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray this Court:

a.    Declare the Coast Guard Orders, the administrative appeals and the Coast Guard's final agency action violated the Administrative Procedures Act, the Port and Waterways Safety Act and the U.S. Constitution;

b.    Vacate the Coast Guard's Orders, as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

c.    Enjoin the Defendant from banning the M/T WILMINA for the ports and waters of the United States;

d.    Enjoin the Defendant from denying the M/T WILMINA a Certificate of Compliance;

e.    Award the costs and attorneys' fees of this application to the Plaintiffs, and,

---

27 *See id.*
28 *See id.*

f.      Award such other relief as it deems appropriate.

Respectfully submitted,

December 9, 2011

W. BRUCE PASFIELD (DC # 495239)
Alston & Bird LLP
The Atlantic Building
950 F Street NW
Washington, DC 20004-1404
(202) 239-3585

*Of counsel:*

MICHAEL G. CHALOS
BRIAN T. MCCARTHY
Chalos, O'Connor & Duffy LLP
366 Main Street
Port Washington, NY 11050
(516) 767-3600

Attorneys for Plaintiffs