**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

)
WILMINA SHIPPING AS, *et al.*      )
      )
       Plaintiffs,      )
      )
       v.      )      Civil Action No. 11-2184 (ABJ)
      )
UNITED STATES DEPARTMENT OF      )
HOMELAND SECURITY, *et al.*      )
      )
       Defendants.      )
_____)

## <u>MEMORANDUM OPINION</u>

This case concerns the scope of the U.S. Coast Guard's authority to ban a foreign ship from U.S. waters when it finds that the ship has violated provisions of federal environmental laws and international environmental treaties. Plaintiffs Wilmina Shipping AS and Wilhelmsen Marine Services AS own and operate the M/T Wilmina, a Norwegian-flagged oceangoing tank vessel. In May 2010, the Coast Guard conducted an investigation of the Wilmina while it was docked at the Port of Corpus Christi and found certain of the ship's pollution control devices to be inoperable or disarmed in violation of U.S. laws and international treaties. As a result, on May 21, 2010, the Coast Guard revoked the ship's certificate of compliance, which a foreign tanker vessel must have to operate in U.S. waters. The Coast Guard further ordered that after the Wilmina left the Port of Corpus Christi, it could not enter any U.S. port or U.S. waters again for three years or until after the ship had developed and implemented an Environmental Compliance Plan ("ECP") acceptable to the Coast Guard, and it had experienced a year of satisfactory audits.

Plaintiffs challenge the order, alleging that the Coast Guard lacked the statutory authority to issue it and that the Coast Guard failed to provide due process of law before revoking the

certificate of compliance.  They also challenge the agency's findings on the merits, arguing that the decision was arbitrary and capricious and improperly based upon information provided by an unreliable whistleblower. The Court deferred consideration of those issues until after the question of the scope of the agency's authority had been resolved.

Defendants filed a motion for summary judgment, and plaintiffs filed a cross-motion for summary judgment.  Plaintiffs ask the Court to vacate the order, enjoin the Coast Guard from excluding the Wilmina from U.S. waters, and enjoin it from withholding the certificate of compliance.

The Court holds that the Coast Guard has the authority to set forth conditions for the restatement of a certificate of compliance, including the sorts of conditions it ordered for the Wilmina.  Under the terms of the statute that governs these vessels, the Coast Guard is required to inform vessel owners of the steps they must take to bring their ships into compliance.  But the Coast Guard does not have the statutory authority to exclude a ship from U.S. waters for a term of years as an alternative to specifying conditions for reinstatement of the certificate.  The Court also finds that the Coast Guard did not violate plaintiffs' due process rights when it revoked the ship's certificate without a pre-deprivation hearing.  Accordingly, the Court grants the defendants' motion for summary judgment in part and denies it in part, and it grants plaintiffs' cross-motion for summary judgment in part and denies it in part.

## BACKGROUND

The M/T Wilmina is a Norwegian-flagged oceangoing tank vessel.  Defs.' Mot. for Summ. J. [Dkt. # 13] ("Defs.' Mot.") at 1; Pls.' Opp. to Defs.' Mot. for Summ. J. and Cross-Mot. for Summ. J. [Dkt. # 20] ("Pls.' Mot.") at 3.  On May 3, 2010, the day before the Wilmina was scheduled to dock at the Port of Corpus Christi, a former member of the ship's engine department, Robert Pabillar, contacted the Coast Guard and reported that the ship's crew had

bypassed its pollution control equipment and discharged oily bilge waste directly overboard.[1]
Pls.' Mot. at 3.  When the Wilmina arrived the next day, the Coast Guard boarded the vessel and
conducted a Port State Control Inspection.  *Id.* at 3–4, citing Port State Control Report of
Inspection ("First Rep. of Inspection") at Administrative Record ("AR") 3.[2]  The Coast Guard
identified three deficiencies unrelated to the Wilmina's pollution control devices, and it issued a
certificate of compliance.  First Rep. of Inspection, AR 3–4; Certificate of Compliance, AR 5–6.

The certificate states that "the ship has been examined and found to be in compliance
with all applicable U.S. and international marine safety and environmental protection standards."
Certificate of Compliance, AR 5.  The second page of the certificate includes a "Notice to
Mariners" that warns:

> **For tank ships only:**  For this Certificate of Compliance to remain in
> effect, the vessel shall be maintained to the safety and construction
> standards as examined for compliance with applicable marine safety and
> environmental protection laws and international conventions.

*Id.* at AR 6.  It further provides that "[e]ntries shall be made on this certification in accordance
with current instructions for the following types of foreign vessel examinations: . . . Other
compliance examinations (i.e. – MARPOL, Ballast Water, etc.) or Deficiency checks."  *Id.*

Later that same evening, the Coast Guard re-boarded the vessel to conduct an
investigation of Pabillar's allegations.  Pls.' Mot. at 4.  This time, it identified a number of
deficiencies with the ship's pollution control equipment that violated the International

---

1    Pabillar had been a pipefitter onboard, but had been relieved of duty before the ship
arrived in port.  Pls.' Mot. at 3.

2    Defendants filed an electronic copy of the administrative record with the Court on May
15, 2010.  [Dkt. # 9].  An index of the administrative record appears on the docket [Dkt. # 16],
but because of the record's size, it was not entered on the electronic docket in its entirety.  A
copy of the administrative record may be viewed at the Clerk's Office.  Page citations to the
administrative record refer to the page numbers appearing at the top right corner of each page in
the record.

Convention to Prevent Pollution from Ships ("MARPOL"). Port State Control Report of Inspection ("Second Rep. of Inspection"), AR 7–9. The deficiencies cited in the report included the facts that: the ship's oily water separator, a device used to remove oil from the ship's bilge water, was inoperable; a discharge pipe, which was supposed to run between the oily water separator and through the ship's hull, had been removed; and parts of the oily water separator were found in a chemical locker. *Id.* The Coast Guard also found that the ship failed to maintain engine room alarms, which were supposed to sound if the pollution control equipment detected a certain level of oil in the water to be discharged. *Id.* Finally, it found that the ship failed to maintain proper records in its oil record book. *Id.*

On May 21, 2010, the Coast Guard issued the Captain of the Port Order No. 093-10 (the "Order"), AR 1–2, that prompted this litigation. The Order listed deficiencies with the ship's pollution control equipment and record keeping, specifically, "inconsistencies in the ship's oil record book, inoperable oily water separating equipment, oily sludge in the overboard discharging piping (where there should be none), and an oily water bypass hose with flanges and oil inside of it." Order at 1, AR 1. It also found that "that the Master and Chief Engineer were unfamiliar with and failed to comply with the Safety Management System (SMS) for the vessel with regard to reporting critical equipment casualties and maintaining records and engine room alarms, including oily water separator alarm printouts." *Id.* The Order further indicates that based upon crewmember interviews and other information gathered during the inspection, the Coast Guard found that the ship had "discharged oily contaminated bilge waste and/or sludge in contravention of MARPOL on several occasions and entered the United States port of Corpus Christi, Texas with an oil record book with false entries." *Id.*

Based upon all of these findings, the Captain of the Port made the following determination:

> [T]he willful noncompliance with MARPOL and APPS [the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901 *et seq.*] that occurred on board your vessel creates a threat to the marine environment. . . . Therefore, I am revoking your vessel's Certificate of Compliance in accordance with 46 U.S.C. § 3711(c).

*Id.*, AR 2.  He went on to state that he was imposing conditions "under the authority of 33 U.S.C. § 1228:"

> Once your vessel departs port it **may not enter the** Sector Corpus Christi Marine Inspection Zone and Captain of the Port Zone, as defined in 46 C.F.R. 3.404-35, for a period of three (3) years, or until the vessel has developed and successfully implemented an Environmental Compliance Plan (ECP) to the satisfaction of the U.S. Coast Guard . . . .  Successful implementation of an agreed upon ECP must include a period of satisfactory audits for at least a one (1) year period, after which I will consider allowing it to enter the Sector Corpus Christi Marine Inspection Zone and Captain of the Port Zone.

*Id.* (bold in original).

On May 27, 2010, the Coast Guard sent plaintiff Wilmina Shipping AS, the ship's owner, a letter stating that the Order would apply to all U.S. ports and navigable waters.  Letter of May 27, 2010 to Wilmina Shipping AS from Captain E. Christensen, Chief, Office of Vessel Activities ("Letter 16711"), AR 557–60.

Plaintiffs took multiple steps to appeal the orders within the Coast Guard.

- On August 25, 2010, plaintiffs appealed to the Captain of the Port or Sector Commander.  Aug. 25, 2010 Letter, AR 191–225.

  On November 19, 2010, the Captain of the Port reaffirmed the original determination that the Wilmina was not in compliance with MARPOL.  Nov. 19, 2010 Letter, AR 188–90.

- On December 9, 2010, plaintiffs appealed to the District Commander of the Eighth Coast Guard District.  Dec. 9, 2012 Letter, AR 436–44.

On February 11, 2011, the Commander of the Eighth Coast Guard District denied the appeal.  Feb. 11, 2011 Letter, AR 432–35.

- On March 1, 2011, plaintiffs appealed the District Commander's decision to the Commander of the Coast Guard Atlantic Area.  Mar. 1, 2011 Letter, AR 488–95.

On April 8, 2011, the Commander affirmed the Eighth Coast Guard District denial.  Apr. 8, 2011 Letter, AR 487.

- On April 27, 2011, plaintiffs appealed to the Vice Admiral of the Atlantic Area.  Apr. 27, 2011 Letter, AR 509–518.

On November 1, 2011, the Assistant Commandant for Prevention Policy, Rear Admiral James Watson, denied that appeal.  Nov. 1, 2011 Letter, AR 496–508.

Having exhausted their administrative appeals, plaintiffs filed this lawsuit, alleging that the Coast Guard lacked the statutory authority to issue the Order and Letter 16711 and contending that they did not receive the due process required under the law when the Coast Guard revoked the Wilmina's certificate of compliance without a pre-deprivation hearing.  They allege violations of the Port and Water Safety Act ("PWSA") and the Administrative Procedures Act ("APA").  Compl. ¶¶ 145–158.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record.  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).  Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5.U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted).

In reviewing an agency's interpretation of a statute, courts use the two-step analysis outlined in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Step one involves determining whether Congress has spoken directly to the precise question at issue. If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and that is the end of the matter. *Id.*; *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 392 F.3d 498, 500 (D.C. Cir. 2004). If the statute is silent or ambiguous on the question, *Chevron* instructs the Court to go on to a second step and determine "whether the agency's answer is based on a permissible construction of the

statute." *Chevron*, 467 U.S. at 843.   An agency's interpretation will warrant deference if it is reasonable.  *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991).

## ANALYSIS

## I.   THE APPLICABLE LEGAL FRAMEWORK

Both the Coast Guard and the ships that wish to enter U.S. waters operate under a series of international treaties and federal statutes, and the challenged actions here must be assessed by reference to a set of overlapping statutory regimes.

### A.   International Convention to Prevent Pollution from Ships ("MARPOL")

The International Convention for the Prevention of Pollution from Ships, commonly referred to as MARPOL, is a multilateral maritime treaty that aims "to achieve the complete elimination of intentional pollution of the marine environment by oil and other harmful substances and the minimization of accidental discharge of such substances."  *U.S. v. Pena*, 684 F.3d 1137, 1142 (11th Cir. 2012), citing MARPOL, Nov. 2, 1973, modified by the Protocol of 1978, opened for signature Feb. 17, 1978. 1340 U.N.T.S. 62, 184.  Both the United States and Norway are signatories to the treaty.  Because MARPOL is not self-executing, each signatory must implement the treaty by establishing rules for ships that fly its flag, certifying that the ships comply with the treaty rules and sanctioning those ships that violate the treaty.  *See United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 307 (2d Cir. 2009), citing MARPOL arts. 1(1), 4(1), 5(1).

MARPOL's Annex I also sets out regulations intended to prevent oil pollution.  *Ionia Mgmt. S.A.*, 555 F.3d at 306.  One of them provides that a vessel may only discharge oily water while under way if the discharged material is processed through specified oil filtration equipment, such as an oily water separator, that traps most of the oil.  *Id.* 306–07, citing MARPOL, reg. 4(c), 1340 U.N.T.S. at 67; Reg. 9, 1340 U.N.T.S. at 202.  MARPOL regulations

also require ships to record all oil transfer operations, including the discharge of bilge water overboard, in an oil record book that is retained on board and available for inspection by the "competent authority" of any government party to MARPOL.  *Id.* at 307, citing MARPOL, reg. 20, 1340 U.N.T.S. at 211–12.

**B.      The Act to Prevent Pollution from Ships**

The United States implements MARPOL through the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 *et seq.*  APPS authorizes the Secretary[3] to administer and enforce MARPOL and to issue regulations to implement the treaty's requirements.  *See* 33 U.S.C. § 1903(a) and (c)(1); 33 C.F.R. § 151.01 *et seq.*  APPS also makes it illegal to knowingly violate MARPOL, and it authorizes the Secretary to investigate possible violations of MARPOL.  33 U.S.C. § 1907(a)–(b).

**C.      Carriage of Liquid Bulk Dangerous Cargoes and Certificates of Compliance**

Chapter 37 of Title 46 addresses the "Carriage of Liquid Bulk Dangerous Cargoes."  It establishes standards for the construction and operation of tank vessels like the Wilmina.  *See, e.g.*, 46 U.S.C. § 3703a (requiring certain tank vessels to have double hulls) and 46 U.S.C. § 3705 (setting forth minimum standards for crude oil tankers).  It also sets out the procedure under which foreign tankers may gain access to United States ports.

Section 3711 of the chapter provides:

> A foreign vessel to which this chapter applies may operate on the navigable waters of the United States, or transfer oil or hazardous material in a port or place under the jurisdiction of the United States, only if the vessel has been issued a certificate of compliance by the Secretary.  The

---

3      The APPS defines "Secretary" to mean the Secretary of the department in which the Coast Guard is operating.  33 U.S.C. §1901(a)(11).  The Coast Guard operates as part of the Department of Homeland Security, except that it operates in the Department of the Navy if directed by the President or by Congress in conjunction with a declaration of war.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 and 14 U.S.C. § 3.

> Secretary may issue the certificate only after the vessel has been examined and found to be in compliance with this chapter and regulations prescribed under this chapter.

46 U.S.C.§ 3711(a).  The certificate here called for compliance with "all applicable U.S. and international marine safety and environmental protection standards," in addition to those found in Chapter 37 of Title 46 and its implementing regulations.  Certificate of Compliance at 2, AR 5–6.

> The statutory provision goes on:

> A certificate shall be suspended or revoked if the Secretary finds that the vessel does not comply with the conditions under which the certificate was issued.

46 U.S.C.§ 3711(c).

Finally, the statute requires that the Coast Guard must notify the owner or other person in charge when a vessel is found to be out of compliance and that it must "state how compliance may be achieved."  46 U.S.C. § 3712.

### D.      The Port and Waterways Safety Act

The Port and Waterways Safety Act, which regulates vessel traffic "in any port or place under the jurisdiction of the United States," authorizes the Secretary[4] to enact measures for protecting navigation and the marine environment.  *United States v. Locke*, 529 U.S. 89, 101 (2000), citing 33 U.S.C. § 1223(a)(1).  The PWSA expressly applies to vessels "subject to the provisions of chapter 37 of Title 46," 33 U.S.C. § 1228, which, as noted above, includes tank vessels like the Wilmina.  46 U.S.C. § 3702(a).

---

4       The PWSA defines "Secretary" to mean the Secretary of the department in which the Coast Guard is operating.  33 U.S.C. § 1222(2).

This statute also sets forth conditions governing access to United States ports:

> No vessel, subject to the provisions of chapter 37 of Title 46, shall operate in the navigable waters of the United States or transfer cargo or residue in any port or place under the jurisdiction of the United States, if such vessel–
>
> (1) has a history of accidents, pollution incidents, or serious repair problems which, as determined by the Secretary, creates reason to believe that such vessel may be unsafe or may create a threat to the marine environment; or
>
> (2) fails to comply with any applicable regulation issued under this chapter, chapter 37 of Title 46, or under any other applicable law or treaty; or
>
> (3) discharges oil or hazardous material in violation of any law of the United States or in a manner or quantities inconsistent with the provisions of any treaty to which the United States is a party. . . .

33. U.S.C. § 1228(a).  There are seven categories of conditions in all.  The statute also authorizes the Secretary to determine "to the satisfaction of the Secretary" when a vessel that was in violation of a condition of subsection (a) "is no longer unsafe or a threat to the marine environment, and is no longer in violation of any applicable law, treaty, regulation or condition." 33 U.S.C. § 1228(b).[5]

The PWSA also sets forth civil and criminal penalties for violations of that statute.  *See* 33 U.S.C. § 1232(a) ("**Any** person who is found by the Secretary, after notice and an opportunity for a hearing, to have violated this chapter or a regulation issued hereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation."); 33 U.S.C. § 1232(b) ("(1) Any person who willfully and knowingly violates this chapter or any regulation issued hereunder commits a class D felony. (2) Any person who, in the willfull and

---

[5]     Regulations issued under the PWSA provide that each District Commander or Captain of the Port may prohibit any vessel, subject to the provisions of chapter 37 of Title 46, U.S. Code, from operating in the navigable waters of the United States pursuant to the statute.  33 C.F.R. Part 160.113.

knowing violation . . . , uses a dangerous weapon, or engages in conduct that causes bodily injury or fear of imminent bodily injury . . . commits a class C felony.").

## II.     THE COAST GUARD'S AUTHORITY TO ISSUE THE ORDER

The Coast Guard revoked the Wilmina's certificate of compliance based on a finding of "willful noncompliance with MARPOL and APPS," which created "a threat to the marine environment."  Order at 2, AR 2.  It premised the revocation on 46 U.S.C. § 3711(c).  The Coast Guard further ordered that once the Wilmina departed, it would not be allowed to reenter the port or any other U.S. waters for three years or until it developed and successfully implemented an ECP "to the satisfaction of the U.S. Coast Guard."  Order at 2, AR 2; Letter 16711, AR 557–60.  The Order specified that "[s]uccessful implementation of an agreed upon ECP must include a period of satisfactory audits" for at least twelve months.  Order at 2, AR at 2.  The Order invoked 33 U.S.C. § 1228, the PWSA, as the authority for these requirements.

Plaintiffs assert that the Coast Guard did not have the statutory power to ban the Wilmina for three years or to require an ECP with a year of successful audits.  Pls.' Mot. at 17–26.  They also contend that the Coast Guard violated their due process rights by revoking the Wilmina's certificate of compliance without a pre-deprivation hearing.  *Id.* at 27–29.

### A.     The Coast Guard Has Statutory Authority to Exclude a Foreign Vessel from U.S. Waters if the Vessel Meets One of the Conditions of the PWSA

Plaintiffs challenge the Coast Guard's authority to issue what they call the "banning order," contending that 33 U.S.C. § 1228, which the Coast Guard relies on to support the Order, does not authorize the Coast Guard either to ban ships for a period of time or to require an ECP with a year of audits.  Pls.' Mot. at 17–26.  First, they argue that Section 1228 limits the Coast Guard's authority to "ban vessels from U.S. waters to actual 'emergency' situations."  *Id.* at 20.  According to plaintiffs, because the Wilmina did not present any "imminent danger" to her

surroundings, the statute provides no authority for the Coast Guard to act. *Id*. at 22–23. Second, plaintiffs assert that the Coast Guard's ability to sanction violations pursuant to its authority under the PWSA is limited to the penalties set forth in 33 U.S.C. § 1232, which establishes specific civil and criminal penalties for violations of that statute. *Id*. at 24. Plaintiffs contend that these penalties are exclusive and that the Order against the Wilmina goes beyond those authorized by the statute. *Id*.

Defendants contend that Section 1228 of the PWSA grants the Coast Guard authority to enforce the PWSA to "effectively prohibit substandard vessels from operating in U.S. waters," whether for a period of time or based on conditions for reinstatement of a revoked certificate. Defs.' Mot. at 40, quoting H.R. Rep. No.95-1384(1) at 6 (1978).

Whether the Coast Guard is authorized by 33 U.S.C. § 1228 to issue an order containing the particular requirements imposed here is a matter of first impression. As an initial matter, the Court finds that this case cannot be resolved at step one of the *Chevron* analysis; Congress has not unambiguously spoken to the "precise question at issue." *Chevron*, 467 U.S. at 842–43. The language of 33 U.S.C. § 1228 neither clearly grants nor clearly withholds authority to issue orders like the one before the Court. The statute categorically states that a tank vessel "shall not operate" in U.S. waters if it falls within any of the seven categories listed in subsection (a), but it does not lay out how the Coast Guard is to administer this prohibition. Therefore, the question to be resolved is whether the Order is "based on a permissible construction of the statute." *Id.* at 843. Based on the language of the PWSA and a consideration of the applicable provisions in the chapter of Title 46 that deals with vessels carrying dangerous liquid cargo, the Court concludes that the Coast Guard's authority is neither as broad as defendants describe it to be, nor as narrow as the plaintiffs maintain.

Chapter 37 of Title 46 gives the Coast Guard broad authority to issue and revoke certificates of compliance to tank vessels carrying dangerous liquid cargo based on its assessment of whether the vessels are in compliance with environmental requirements. That chapter also authorizes the Coast Guard to revoke or suspend a certificate when it determines that a vessel is out of compliance. Indeed, the statute mandates revocation under those circumstances. And the Coast Guard is required by the same law to specify the steps that a vessel must complete in order to regain a certificate. Similarly, the Ports and Waterways Safety Act empowers the Coast Guard to enforce environmental requirements by denying entry to ships that are not in compliance with its provisions. The PWSA also proclaims that no vessel shall operate in U.S. waters if it fails to comply with regulations issued under it or under any other applicable law or treaty. That prohibition becomes inapplicable only if the vessel owner can prove to the satisfaction of the Secretary that the vessel is no longer a threat to the environment, and that it is no longer in violation of any applicable law or regulation. So, under the scheme of overlapping statutes that govern this area, the granting, withdrawal, and restoration of permission to enter U.S. waters are all committed to the judgment of the Coast Guard, but they are all expressly predicated on compliance. It was therefore reasonable for the agency to conclude that the statute permitted it to call for the development of, and proof of adherence to, an approved environmental plan before the Wilmina could return. But neither statute authorized the agency to bar the vessel's reentry pending the expiration of a term of years of some arbitrary duration that bore no relationship to the ship's regulatory compliance or the amelioration of the threat to the environment. As plaintiffs suggest, the three year ban was, in effect, a penalty and nothing more, and the PWSA did not grant the agency the power to craft new sanctions for environmental violations.

1.      **The Coast Guard's authority under the PWAS is not limited to emergencies.**

The Coast Guard has authority under 33 U.S.C. § 1228 to require a ship to satisfy certain requirements before allowing a prohibited vessel to reenter U.S. waters.  Plaintiffs argue that the statute does not authorize the Order against the Wilmina because the ship was not in imminent danger of "colliding with another vessel, alliding with bridge or structure, running aground, exploding or catching fire" when the Order was issued.  Pls.' Mot. at 21 n.17.  They cite the PWSA's legislative history and case law and submit that the statute was "drafted in response to, and in order to prevent, catastrophic marine casualties" and applies only in "maritime emergencies."  Pls.' Mot. at 20–21.  But a statute's text is the first resource courts must consult when construing a piece of legislation.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).  And Section 1228 contains no requirement of an imminent threat.

Section 1228 is entitled "conditions for entry," and it is cast in terms of a flat prohibition: "no vessel . . . shall operate . . . if . . . ."  33 U.S.C. § 1228(a).  There is nothing in the provision that limits its applicability to exigent circumstances.  Section 1228(a) enumerates the seven sets of conditions under which a ship may not operate in United States waters, and none of them describe a catastrophic or emergent situation.  33 U.S.C. § 1228(a).  Under subsection (a)(1), simply having a "history" of accidents, pollution incidents, or serious repair problems that "may create a threat" to the marine environment is sufficient to render a foreign ship ineligible to operate in U.S. waters.  33 U.S.C. § 1228(a)(1).  The conditions in subparagraphs (5), (6), and (7) regarding crew levels and crew qualifications also do not require an emergency before the Coast Guard can act; there is nothing about the requirement that a ship must have "at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English"

that suggests that the conditions for operation listed in the statute are only triggered in times of crisis.  33 U.S.C § 1228(a)(7).

Furthermore, the legislative history plaintiffs cite does not support their interpretation. They argue that Congress passed the PWSA "to cope with the increasing safety hazards of maritime transportation and with pollution resulting from operation and casualties of vessels carrying oil or other hazardous substances in bulk . . . What is most urgently needed is legislation that will put the emphasis on prevention. . . ."). Pls.' Mot. at 20 n.16 (citing U.S. Congressional and Administrative News 92-339, p. 2768–69 and House of Representatives Reports, Report 95-1384, p. 10).  But if the statute's stated purpose was to *prevent* emergencies, it does not follow that the Coast Guard must wait for an emergency to materialize before it is authorized to act.

The cases plaintiffs cite do not support their argument either.  They cite *Llamera v. United States*, 15 Cl. Ct. 593, 598 (1988) for its holding that the PWSA authorizes the Coast Guard to order a vessel to anchor pending correction of deficiencies.  They also cite *Chronos Shipping v. U.S. Coast Guard*, 957 F. Supp. 667, 669 (E.D. Pa. 1997), which upheld the imposition of civil penalties for a violation of the PWSA for failure to report a cracked hull in a cargo ship carrying crude oil. Pls.' Mot. at 21.  But neither case holds that the Coast Guard can act only in the face of an imminent or actual emergency.  In any event, the grounds for action cited in the Order include the finding that the oily water separation equipment and the engine room alarms were inoperable *at the time,* not just that they had been found to be out of compliance with regulations in the past.

**2.    The Coast Guard's authority to address violations of MARPOL is not limited to penalties in Section 1232.**

Plaintiffs also contend that the Order overstepped the Coast Guard's authority because it disregards Section 1232 of the PWSA.  Pls.' Mot. at 24–25.   This section, entitled "Enforcement Provisions," establishes civil penalties to be imposed on "[a]ny person who is found by the Secretary, after notice and an opportunity for a hearing, to have violated this chapter or a regulation issued hereunder," as well as criminal penalties for willful and knowing violations.  33 U.S.C. § 1232(a)(1)–(b)(2).   According to plaintiffs, the Coast Guard's enforcement authority under the PWSA is limited to the civil and criminal penalties in Section 1232.

Plaintiffs' argument is not supported by the language of the statute.  First of all, Section 1232(a)(1) sets out penalties for violations of the PSWA itself.  33 U.S.C. § 1232(a)(1) (stating the provision applies to those who have violated "this chapter or a regulation issued hereunder"). There are provisions in the statute that call for vessels to meet specific operating or system requirements that are set out in the statute or will be included in regulations issued by the Secretary.  *See, e.g.*, 33 U.S.C. § 1223 and 1223a.  So, the enforcement provisions in the statute would cover violations of those requirements.  But the provision is silent on the Coast Guard's authority to address violations of other U.S. laws or treaties – which is what the Coast Guard found here.  *See* Order at 2, AR 2 (imposing the Order because the Wilmina violated MARPOL and APPS, not the PWSA).  And there is nothing about the availability of sanctions for violations of other duties created under the statute that means that the Coast Guard has no ability to implement the clear and mandatory prohibition set out in Section 1228:  "no vessel . . .  shall operate . . . ."

Furthermore, the civil and criminal penalties are not the only enforcement options available under the act.  The very section cited by the plaintiffs also establishes denial of entry as an enforcement tool:

> Except as provided in section 1228 of this title, the Secretary may, subject to recognized principles of international law, deny entry into the navigable waters of the United States to any port or place under the jurisdiction of the United States or to any vessel not in compliance with the provisions of this chapter or the regulations issued hereunder.

33 U.S.C. § 1232(e).[6]

The Captain of the Port found that the Wilmina was in violation of both MARPOL and APPS and that its non-compliance created "a threat to the marine environment of the United States."  Order at 1, AR 1.  Thus, the Order includes an implicit finding that the vessel violated the provision in section 1228 prohibiting a vessel from operating in the navigable waters in the United States if it "fails to comply with any applicable regulation issued . . . under any other applicable law or treaty," § 1228(a)(2), or it "has a history of . . .  serious repair problems which . . . creates reason to believe that [it] . . . may create a threat to the marine environment," § 1228(a)(1).  So, putting aside the question of whether those findings were fairly based on the record, to the extent the Order denied the Wilmina entry into the ports and navigable waters of the United States, it was authorized under the PWSA.  What remains to be determined is whether the Coast Guard's fashioning of a three-year bar or the decision to condition the ship's reentry on twelve months of compliance with an approved environmental plan exceeded the scope of its authority.

---

6       The use of the phrase "except as provided in section 1228 of this title" in section 1232(e) is somewhat confusing since section 1228 – certificates of compliance – also creates a mechanism for denying entry to ships that are out of compliance.  But that section contains its own exception, lifting the prohibition against entry and operation in U.S. waters for ships that have demonstrated their environmental safety and return to compliance to the satisfaction of the Secretary.  Section 1232(e) thus seems to allow for that same possibility.

**B.      The Coast Guard's Construction of the Statute is Permissible in Part**

**1.      Section 1228 authorizes the Coast Guard to set conditions for the Wilmina's future ability to operate in U.S. waters, and the conditions the Coast Guard established to reinstate the Wilmina certificate of compliance are reasonable.**

Section 1228 of the PWSA speaks in mandatory terms.  It states that no tanker like the

Wilmina "shall operate in the navigable waters of the United States" if it:

> (1) has a history of accidents, pollution incidents, or serious repair problems which, as determined by the Secretary, creates reason to believe that such vessel may be unsafe or may create a threat to the marine environment; or

> (2) fails to comply with any applicable regulation issued under this chapter, chapter 37 of title 46, or under any other applicable law or treaty; or

> (3) discharges oil or hazardous material in violation of any law of the United States or in a manner or quantities inconsistent with the provisions of any treaty to which the United States is a party; or

> (4) does not comply with any applicable vessel traffic service requirements; or

> (5) is manned by one or more officers who are licensed by a certificating state which the Secretary has determined, pursuant to section 9101 of title 46, does not have standards for licensing and certification of seafarers which are comparable to or more stringent than United States standards or international standards which are accepted by the United States; or

> (6) is not manned in compliance with manning levels as determined by the Secretary to be necessary to insure the safe navigation of the vessel; or

> (7) while underway, does not have at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English.

33 U.S.C. § 1228(a).  In light of the findings in the Order, defendants assert that the Wilmina met

the first three of the conditions in subsection (a), any one of which authorized the Coast Guard to

bar the ship from U.S. waters.  Defs.' Mot. at 40.

Furthermore, the statute expressly delegates broad authority to the Secretary to determine whether and when a vessel should be deemed to be in compliance again.  It provides that a vessel "shall not" be subject to the conditions for entry:

> *if* the owner or operator of such vessel proves, *to the satisfaction of the Secretary*, that such vessel is no longer unsafe or a threat to the marine environment, and is no longer in violation of any applicable law, treaty, regulation or condition, as appropriate.

33 U.S.C. § 1228(b) (emphasis added).

Thus, Congress left it to the Coast Guard to use its expertise as the regulatory agency entrusted with the administration of the statute to determine when a ship may reenter U.S. waters.  *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 600 (1988) (statute enabling an agency official to act as he "shall deem . . . necessary" "fairly exudes deference" to official's decisions); *Conn. Dept. of Children and Youth Servs. v. Dep't of Health and Human Servs.*, 9 F.3d 981, 985 (D.C. Cir. 1993) (decision made pursuant "to the satisfaction of the Secretary" only reviewable to the extent the statute lists specific criteria that must be considered).  And the Court must "give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'"  *Hüls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996), quoting *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992).

Here, the imposition of the requirement that the Wilmina implement an environmental compliance plan and complete a year of successful audits before being admitted to United States ports again fell well within the scope of the Coast Guard's authority under the statute.  The Coast Guard found that the ship's "senior officers failed to . . . implement the safety management system as required by the International Safety Management (ISM) Code, and 46 U.S.C. §3201 *et seq.*," and that the audit requirement of the ISM Code "is obviously not being properly implemented by your company on your vessel."  Order at 1–2, AR 1–2.  It concluded that this

failure can only be corrected with "an additional mandatory oversight system that requires multiple vessel audits by independent auditors to verify compliance." *Id.* In response to plaintiffs' appeal, Rear Admiral Landry explained that "successful implementation of an ECP can only be demonstrated by a series of audits of a period of time that demonstrate that the climate and practices on board the vessel comport to the intended goals of the ECP to minimize the threat of pollution to the marine environment." Feb. 11, 2011 Letter, AR 434. And Rear Admiral James Watson also observed that one year "is generally the amount of time it takes to properly implement an ECP." Nov. 1, 2011 Letter, AR 501.

The Coast Guard was tasked by Congress to ascertain to its satisfaction whether a ship has brought itself back into compliance and whether it poses a threat to the marine environment in the future. It was therefore granted the discretion, and it has the expertise, to define the sort of showing that would enable it to draw that conclusion. Thus, under *Chevron* step two, the Court finds that it was permissible for the agency to construe 33 U.S.C § 1228 to authorize it to call for the development of an acceptable plan and twelve months of demonstrated compliance with that plan as the conditions for the reissuance of the certificate of compliance. This conclusion is reinforced by fact that Congress imposed the requirement in 46 U.S.C. § 3712 that the Secretary inform the owner, operator, or manager of a vessel found not to be in compliance "how compliance may be achieved."

>   **2.     The Coast Guard does not have authority to ban a ship for a period of time without providing a path for reinstatement of its certificate of compliance.**

The Coast Guard also ordered, in the alternative, that the Wilmina would be excluded from U.S. waters for three years if it did not implement a new ECP and complete one year of successful audits. According to defendants, the PWSA's instruction that the Coast Guard determine to its "satisfaction" when a ship is no longer in violation of subsection (a) gives the

agency the authority to simply ban a ship from U.S. waters without anything more.  Defs.' Mot. at 40.  But subsection  (b) of Section 1228 uses the same automatic and mandatory language that appears in subsection (a) when it states that "this section *shall not apply* if the owner or operator . . . proves, to the satisfaction of the Secretary" that the ship is no longer unsafe or a threat and is no longer violating applicable laws, treaties, regulations or conditions.  33 U.S.C. § 1228(b) (emphasis added).   In other words, the statute requires the prohibition in subsection (a) to be removed when an owner or operator demonstrates that the safety hazard or threat or violation that gave rise to the prohibition no longer exists.  To be sure, the PWSA leaves it to the Coast Guard to determine whether the offending condition no longer exists, and to determine what is necessary to show that it no longer exists.  But it does not allow the Coast Guard to make no determination and simply lift the prohibition with the passage of time.

Section 37 of Title 46 also requires the Coast Guard to do more.[7]  That statute provides that no foreign tank ship shall operate in U.S. waters without a certificate of compliance, and that the Coast Guard "may" issue a certificate of compliance if it determines that a ship complies with applicable laws.  46 U.S.C. § 3711.  The permissive "may" in Section 3711(a) indicates that the Coast Guard is not required to issue a certificate, but the next section directs that the Coast Guard "shall" notify the owner or other party responsible for a vessel found not to be in

---

[7]     Although the Order relies on 46 U.S.C. § 3711 only for the Coast Guard's authority to revoke the Wilmina's certificate of compliance and not for barring the ship from U.S. waters, defendants cited 46 U.S.C. § 3711 in oral argument as support for the three-year ban.  Hrg. Tr. [Dkt. # 25] at 9 (answering whether there are regulations under the PWSA that authorize the three-year bar, defense counsel stated, "I'm not aware of regulations that flesh this out. What I would – what I would look at is 46 U.S. Code 3711(c).  As the Court has mentioned, the certificate shall be suspended if the secretary finds the vessel does not comply with the conditions under which it was issued.")  Furthermore, a certificate of compliance certifies a vessel's compliance not only with chapter 37 of Title 46 but also with "all applicable U.S. and international marine safety and environmental protection standards."  *Compare* 46 U.S.C. § 3711(a) *with* Certificate of Compliance at 2, AR 5–6.

compliance "*and state how compliance may be achieved.*"  46 U.S.C. § 3712 (emphasis added).[8]

So if the Coast Guard revokes a ship's certificate of compliance, it must advise the owners of

what they need to do to have the certificate reinstated.

Defendants argue that the three year ban is meant to be the "stick" to the "carrot" of

allowing an ECP with one year of audits.  Hr. Tr. at 17 ("[W]ithout something beyond the one-

year period, there's simply no incentive to comply.")  They also assert that neither 46 U.S.C §

3711 nor the PWSA prescribe the amount of time a certificate can remain revoked or what

conditions a ship must satisfy before the Coast Guard reinstates a revoked certificate.  So,

according to defendants, Congress left both issues to the agency's discretion.  But the statute

does make it clear what must be shown for a certificate to be reinstated; there is mandatory

language in 33 U.S.C. § 1228(b) stating that the prohibition in subsection (a) "shall not apply" if

an owner can prove to the agency's satisfaction that the condition no longer exists.  And there is

an express requirement in 46 U.S.C. § 3712 that the agency tell a ship's owner "how compliance

may be achieved" if a certificate has been revoked.  Accordingly, the three-year ban in the Order

does not derive from a permissible construction of the statute, and the Court holds that the Coast

Guard did not have the authority to impose that portion of the Order.

## III.   THE COAST GUARD DID NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS IN ISSUING THE ORDER

Plaintiffs also contend that the Coast Guard violated their due process rights under the

Fifth Amendment of the U.S. Constitution by failing to provide them notice of the alleged

violation and the opportunity for a hearing.  Pls.' Mot at 27; *see also* Compl. ¶¶ 69–70.  The due

process clause of the Fifth Amendment protects a finite range of property and liberty interests.

---

8      Rear Admiral Watson acknowledge this requirement in the agency's final action:  "When barring a vessel from U.S. waters, the Coast Guard is required to notify the owner and operators that the vessel is found not in compliance and state how compliance may be achieved."  Nov. 1, 2011 Letter, AR 501.

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). It does not absolutely protect these interests from deprivation, but only from deprivation without due process of law. *Parratt v. Taylor*, 451 U.S. 527, 537 (1981); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). To prevail on their due process claim, plaintiffs must demonstrate that they possessed a constitutionally protected property or liberty interest and that they were deprived of that interest without sufficient legal process. *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010).

### A.     Plaintiffs Have a Constitutionally Protected Property Interest

To have a constitutionally protected property interest, plaintiffs must have more that an "abstract need" for or "unilateral expectation" of that interest. *Roth*, 408 U.S. at 576. Plaintiffs' interest must rise to the level of "a legitimate claim of entitlement" to implicate due process. *Id*. Whether a legitimate claim of entitlement exists is determined by examining the law that creates the claimed property interest. *Id*. at 577–78 (holding that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits;" finding no property interest in the plaintiff's employment at state university because his terms of employment provided no basis to renew his contract); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–40 (1985) (holding that respondents had property right in continued employment because classified civil service employees were entitled to retain their positions "during good behavior and efficient service" and they could not be dismissed except for "misfeasance, malfeasance, or nonfeasance in office" under relevant statute). The

Court must therefore analyze whether plaintiffs have a property interest in the Wilmina's certificate of compliance in the context of the statute that creates the claimed property interest.[9]

Plaintiffs compare a ship's certificate of compliance to a driver's license, arguing that deprivation of the certificate triggered the procedural safeguards of the due process clause. Pls.' Reply in Supp. of Cross-Mot. for Summ. J. [Dkt. # 24] ("Pls.' Reply") at 19. Defendants counter that plaintiffs' interest in the certificate was a mere unilateral expectation of current and continued benefit and that plaintiff had no property interest in the certificate because "government officials may grant or deny [the benefit] in their discretion." Defs.' Reply to Pls.' Response to Mot. for Summ. J. and Resp. to Pls.' Cross-Mot. for Summ. J. [Dkt. # 22] ("Defs.' Reply") at 17, quoting *Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

---

9       Defendants contend that foreign vessels "have no particular right to do business in U.S. ports," and they point to the cases that hold there is no constitutionally protected right to import goods excluded by Congress. Defs.' Reply at 18, citing *B-West Imports, Inc. v. United States*, 880 F. Supp. 853, 863 (Ct. Int'l Trade 1995); *Abby Dodge v. United States*, 223 U.S. 166, 176 (1912); *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989); *Ganadera Indus. v. S.A.V. Block*, 727 F.2d 1156, 1160 (D.C. Cir. 1984). But the cases defendants cite do not hold that there can never be a protected property interest involving foreign commerce; they assess the particular statutory schemes involved to determine if they create a property interest.

In *Ganadera*, the D.C. Circuit analyzed the statutory scheme that prohibits the importation of meat into the United States under specific conditions. 727 F.2d at 1159. That scheme relies on foreign officials to certify the meat in the first instance. But even after a foreign official certifies that a product qualifies, the USDA still may, at its discretion, terminate a foreign producer's right to import. *Id.* at 1159–60. The statute is analogous to the PWSA in that it is prohibitory (no meat "shall be imported . . . if . . . ") and that it commits the lifting of that prohibition to the agency's discretion. Under these circumstances, the court found no property interest. But there is another statute at work here, in addition to the PWSA. Under the chapter governing ships carrying dangerous liquid cargo, the federal government is involved in the business of granting licenses, and the statute limits the agency's authority to revoke a certificate after it is granted. 46 U.S.C. §§ 3711–12. *B-West Imports* recognizes that to determine whether a license to engage in commerce in the United States creates a constitutionally protected interest, the claimed interest must be analyzed in the context of the statute, rules, or understandings that create it. 880 F. Supp. at 863–864. The court analyzed a statute governing the importation of defense articles, and it found no property interest because the statute gave no entitlement "to the continued importation of defense articles once a license has been issued." *Id.* at 864. Here, the statute presumes the certificate will remain "valid" once issued for up to two years.

While plaintiffs may have had no actionable property interest in the certificate before it was granted, an interest did attach once the certificate was in hand.  Section 3711 provides that a vessel may only operate on U.S. navigable waters if it has been issued a certificate and that the Secretary may issue one only after the vessel has been examined and found to be in compliance. But once issued, a certificate is valid for up to 24 months, and it may be renewed.  46 U.S.C. § 3711.  The Coast Guard can revoke it only if the Coast Guard finds the vessel does not comply with the conditions under which it was issued.  *Id.*  Because the agency's discretion to revoke is not unfettered, but it must be based on a factual predicate, plaintiffs have a protected property interest in the continued validity of the certificate.  This conclusion is consistent with the D.C. Circuit's decision in *3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072–73 (D.C. Cir. 2003), in which the court distinguished between cases involving a permit *applicant's* property interest and those involving a permit *holder*.  The court ruled that a permit holder has "more than a unilateral expectation" in the permit's continued effect if the government's discretion to revoke or suspend it is limited.  *See also Barry v. Barchi*, 443 U.S. 55, 64 n.11 (1979) (holding that plaintiff had property interest in horse trainer's license because under state law license could "not be revoked or suspended at the discretion of the racing authorities"). *Compare Fried v. Hinson*, 78 F.3d 688, 692 (D.C. Cir. 1996) (finding no property interest in plaintiff's continued designation as a pilot examiner when that status could be freely rescinded); *Dorna v. Houle*, 721 F.2d 1182, 1184–86 (9th Cir. 1983), *cert. denied*, 466 U.S. 950 (1984) (finding no property interest in a permit issued to veterinarian to conduct tests on cattle "held at

the sufferance and will of the officials charged with administering the permit program").[10] Accordingly, the Court holds that plaintiffs have a constitutionally protected property interest in the Wilmina's certificate of service and, therefore, it must go on to address the question of "what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

**B.      Plaintiffs were Not Entitled to a Pre-Deprivation Hearing**

The Court's ruling that plaintiffs had a protected property interest does not automatically entitle them to notice and a hearing before revocation of the Wilmina's certificate.   All that is required before the deprivation of a protected interest is "notice and opportunity for hearing *appropriate to the nature of the case.*"   *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (emphasis added).   "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."   *Morrissey*, 408 U.S. at 481.   The process that is due is determined by balancing three criteria:   the private interest affected by the governmental action, the probable value of additional procedural safeguards, and the government's interest in the existing procedure.   *Mathews v. Eldridge*, 424 U.S. at 335.   The balance of these factors shows that plaintiffs were provided the process that was due.

**1.      Plaintiffs' private interest affected by the Coast Guard's action**

Plaintiffs' private interest in maintaining the Wilmina's certificate is not significant. Although the certificate is necessary for the Wilmina to operate in U.S. waters, deprivation of the certificate does not prevent the Wilmina from calling on ports outside U.S. waters, nor does it prevent any other ships plaintiffs may have from calling on ports in the United States.

---

10      Defendants also assert that plaintiffs had no protected property interest because their continued possession of the certificate depended on the ship continually meeting certain safety and environmental standards.  Defs.' Reply at 17.  But many recognized property interests are subject to conditions that must be continuously met.  *See, e.g.*, *Loudermill*, 470 U.S. at 538–39 (continuing condition of "good behavior and efficient service" to retain employment); *Mathews*, 424 U.S. at 336 (continuing condition of disability to receive disability benefits).

Accordingly, their private interest is not the type of significant property interest that requires the full panoply of procedural process.  *Compare Goldberg v. Kelly*, 397 U.S. 254, 260–61 (1970) (deprivation of welfare benefits requires pre-deprivation notice and hearing), *and Sniadach v. Family Finance Corp.*, 395 U.S. 337, 342–43 (1969) (deprivation of all wages requires pre-deprivation notice and hearing), *with Barry v. Barchi*, 443 U.S. 55, 64 (post-deprivation process is sufficient to revoke professional license), *and Dixon v. Love*, 431 U.S. 105, 112–15 (post-deprivation process is sufficient to revoke driver's license of a truck driver).  This seems particularly true in this case, where the certificate was only in hand for seventeen days before it was revoked.[11]  Therefore, the first *Mathews* factor does not indicate that plaintiffs were entitled to a pre-deprivation hearing.

### 2.      The probable value of additional procedure

"Central to the evaluation of any administrative process is the nature of the relevant inquiry."  *Mathews*, 424 U.S. at 343.  The Supreme Court has found additional procedures to be valuable when an agency's determination turns on "issues of witness credibility and veracity."  *Id.* at 343–44; *see also Goldberg*, 397 U.S. at 269.  On the other hand, when determinations turn on "routine, standard, and unbiased" evaluation of physical fact by specialists, the value of a pre-deprivation hearing is lower.  *Mathews*, 424 U.S. at 344, quoting *Richardson v. Perales*, 402 U.S. 389, 404 (1971).  The issue is whether the procedures used present a "risk of an erroneous deprivation" of plaintiffs' interest.  *Mathews*, 424 U.S. at 335.  The number of layers of review and the opportunities given to plaintiffs to submit arguments and supporting materials minimized that risk in this case, as did the nature of the inquiry in question.

---

11      The fact that foreign companies are not automatically entitled to do business here and that foreign commerce may be regulated by Congress, *Abby Dodge*, 223 U.S. at 176, further supports the conclusion that plaintiffs' property interest is not particularly significant.

While plaintiffs have amassed considerable information to undermine the credibility of the whistleblower who brought the issues to the Coast Guard's attention, and to question his motivation, the findings that led to the issuance of the Order were primarily based upon the inspectors' observations on board the ship and not the witness's accounts of events at sea.  The Coast Guard conducted an on board investigation of the Wilmina and its pollution control devices.  It examined the physical evidence on the ship and found multiple problems.  *See* Order at 1, AR 1 (identifying inconsistencies found in the inspection with oil record book, inoperable oily water separating equipment, oily sludge in the overboard discharge piping, and an oily water bypass hose with flanges and oil  inside of it).  Thus, the Coast Guard's determination turned on routine, standard, and unbiased evaluation of physical fact by specialists, not on the credibility of a witness account.

Furthermore, the administrative appeals process was sufficient to satisfy the requirements of due process in this case.  The Coast Guard's appeals process provides opportunity for reconsideration of an order, two levels of further appeal within the agency with the opportunity for plaintiffs to provide documentation and evidence as well as rebuttal materials, and a final appeal decided on the record.  33 C.F.R. Part 160.7(a)–(d).[12]

After the Coast Guard made its initial determination, plaintiffs appealed the Order and Letter 16711 to the District Commander, explaining why they believed the Coast Guard's determination was incorrect.  *See* Appeal of COPT Order No, 093-10 and Office of Vessel Activity Order No. 16711, AR 191–225.[13]  They then appealed to the District Commander of the

---

[12]    The two intermediate levels of appeal, "as a matter of discretion, allow oral presentation on the issues," 33 C.F.R. Part 160.7(b), (c), although oral presentations were not allowed in plaintiffs' case.  Oral argument would have been based on the written submissions in any event.

[13]    The Coast Guard treated the appeal, first, as a request for reconsideration.  *See* Nov. 19, 2010 Letter, AR 188.

Eighth Coast Guard District, Dec. 9, 2012 Letter, AR 436–44; then to the Commander of the Coast Guard Atlantic Area, Mar. 1, 2011 Letter, AR 488–95; and finally the Vice Admiral of the Atlantic Area, Apr. 27, 2011 Letter, AR 509–518.   Although this process was carried out in writing, it afforded the plaintiffs a full opportunity to present arguments and refute the Coast Guard's findings.   *See Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 339 (D.C. Cir. 2011) (ruling that giving plaintiff multiple opportunities to be heard by the agency through the submission of argument and evidence in writing was sufficient due process because "he had ample opportunity to apprise the Coast Guard of his views").   Courts have found that the type of post-deprivation administrative appeal provided here can satisfy due process, even when the balance of the *Mathews* factors is more favorable to the plaintiff.   *See Mallen*, 486 U.S. at 243 (ruling that post-deprivation hearing was constitutional in case involving appellee's interest in continued employment, which is "without doubt an important interest that ought not be interrupted without substantial justification. We have repeatedly recognized the severity of depriving someone of his or her livelihood.").   Thus, the second *Mathews* factor weighs against a constitutional requirement for a pre-deprivation hearing.

### 3.    The government's interest

"An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."   *Mallen*, 486 U.S. at 240.   A post-deprivation hearing is constitutionally permissible when the government has taken immediate action to avoid the risk of an immediate or continuing harm.   *See id.* at 231–32 (immediate suspension of a bank manager after being charged with a finance-related crime due to risk to depositors); *Gilbert v. Homar*, 520 U.S. 924, 932   (immediate suspension of a state university police officer due to officer's "position of public trust and high public visibility" after

being charged with a drug-related offense); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299–303 (1981) (immediate cessation of mining activity due to risk to public safety and the environment); *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 315 (1908) (immediate seizure and destruction of allegedly tainted foodstuffs due to risk to public health).

Here, the government's interest is strong and it weighs heavily in the balance.  Congress passed the PWSA because it found that "navigation and vessel safety, protection of the marine environment, and safety and security of United States ports and waterways are matters of major national importance."  33 U.S.C. § 1221(a).  If a ship is operating in a manner detrimental to the marine environment and poses a risk to that environment and public safety, the government has a strong interest in immediately addressing this problem.  Indeed, the statute requires that it must. Deprivation of property to "protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action."  *Hodel*, 452 U.S. at 300, quoting *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599 (1950).  And Congress seemed to recognize that distinction when it specified in the enforcement provisions section of the PWSA that a civil monetary penalty could only be imposed "after notice and opportunity for a hearing," 33 U.S.C. § 1232(a), but it included no such requirement when it granted the Secretary the authority to deny a vessel entry to U.S. waters.  33 U.S.C. § 1232(e) ("the Secretary may" deny entry).

Thus, after balancing the *Mathews* factors in this case, the Court holds that plaintiffs were not entitled to a pre-deprivation hearing before the Coast Guard revoked the Wilmina's certificate of compliance and that they were provided the process that was due.

## CONCLUSION

For the reasons explained above, the Court rules that the Coast Guard had the authority to revoke the Wilmina's certificate and to impose as conditions for its reissuance the submission of

a satisfactory environmental plan and a year of successful audits. But it did not have the authority to ban the ship from entering U.S. waters for a term of three years, and that term of the Order is hereby declared invalid.  The Court further rules that plaintiffs' due process rights were not violated.

This resolves the question of the Coast Guard's authority to act as it did, but not the validity of its actions on the merits.  Plaintiffs have also challenged the agency action on the grounds that it was arbitrary and capricious and not supported by the record.  The parties will be directed by separate order to meet and confer and submit to the Court a proposed plan and schedule for further proceedings on those issues.


AMY BERMAN JACKSON
United States District Judge

DATE:  March 27, 2013