**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                              )
WILMINA SHIPPING AS, *et al.*,                )
                                                              )
                            Plaintiffs,             )
                                                              )
              v.                                          )          Civil Action No. 11-2184 (ABJ)
                                                              )
UNITED STATES DEPARTMENT OF        )
HOMELAND SECURITY, *et al.*,               )
                                                              )
                            Defendants.           )
_____)

## <u>MEMORANDUM OPINION</u>

In this action, plaintiffs Wilmina Shipping AS and Wilhelmsen Marine Services AS have

challenged an order issued by the U.S. Coast Guard on May 21, 2010.  Plaintiffs own and

operate a Norwegian-flagged oceangoing tank vessel, the M/T Wilmina.  The Coast Guard

issued the order in question after inspecting the ship when it was docked in Corpus Christi,

Texas.  Based on the inspections, witness statements, and evidence collected from the Wilmina,

the agency concluded that the ship's pollution control devices were inoperable or disarmed and

that the ship had failed to comply with its own Safety Management System.  It issued an order

revoking the ship's Certificate of Compliance and ordered that the ship could not reenter U.S.

waters for three years or until after plaintiffs had developed and implemented an acceptable

Environmental Compliance Plan ("ECP") and had passed one year of satisfactory audits.

Plaintiffs sued, asserting that the agency did not have the statutory authority to issue the

order and claiming due process violations.  Compl. [Dkt. # 1].  They asked the Court to declare

that the Coast Guard violated the Administrative Procedure Act ("APA"), the Port and

Waterways Safety Act ("PWSA"), and the U.S. Constitution.  *Id.* ¶¶ 145–58 and Prayer for Relief.

The Court bifurcated the proceedings in this case, directing the parties to brief the legal issues of the agency's authority and due process claims first.  After receiving briefs and hearing oral argument on these issues,[1] the Court ruled that the Coast Guard did have the statutory authority to order plaintiffs to develop and implement an environmental compliance plan that was acceptable to the Coast Guard and to require a year of satisfactory audits before permitting the ship to reenter U.S. waters, but that it did not have the authority to simply ban the ship from U.S. waters for three years.  *Wilmina Shipping AS v. DHS*, 934 F. Supp. 2d 1 (D.D.C. 2013).  The Court also held that plaintiffs' due process rights were not violated.  *Id.*

Following that decision, defendants filed a motion for summary judgment on the merits, asserting that the Coast Guard's order was supported by the administrative record.  Defs.' Mot. for Summ. J. on the Merits ("Defs.' Mot.") and Mem. in Supp. ("Defs.' Mem.") [Dkt. # 38] at 1, citing 5 U.S.C. § 706(2).  Plaintiffs filed a cross-motion for summary judgment, presenting three arguments:  (1) that the order is not severable, so the Court's finding that one part of the order was invalid makes the entire order invalid; (2) that the agency violated its own policies and procedures in issuing the order; and (3) that the evidence in the administrative record did not support the order.  Pls.' Opp. and Cross-Mot. for Summ. J. [Dkt. ## 39, 40] ("Pls.' Opp. & Cross-Mot.").

Upon consideration of the parties' arguments, the Court holds that the Coast Guard's order is severable, that the agency did not violate its policies and procedures in issuing the order,

---

1       *See* Defs.' Mot. for Summ. J. [Dkt. # 13], Pls.' Opp. and Cross-Mot. for Summ. J. [Dkt. ## 20, 21], Defs.' Reply and Opp. to Cross-Mot. [Dkt. ## 22, 23], and Pls.' Reply [Dkt. # 24].  The Court heard oral argument on December 4, 2012.

and that the evidence in the administrative record supports the order.   Accordingly, the Court will grant defendants' motion for summary judgment and deny plaintiffs' cross-motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).   To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).   The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).   A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).   In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A);  in excess of statutory authority, § 706(2)(C); or "without observance of procedure required by law." § 706(2)(D).  But the scope of review is narrow.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  An agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and a court must not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. at 43.  A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a rational connection between the facts found and the choice made."  *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted) (internal quotation marks omitted).   The party challenging the agency action bears the burden of proof.  *Abington Crest Nursing & Rehab. Ctr. v. Sebelius,* 575 F.3d 717, 722 (D.C. Cir. 2009).

## BACKGROUND

Because many of the facts in this case were sets forth in the Court's earlier ruling, *Wilmina Shipping AS v. DHS*, 934 F. Supp. 2d at 3–5, the Court will only recount the facts relevant to the parties' current motions.

On May 3, 2010, the day before the Wilmina was scheduled to arrive at the Port of Corpus Christi, the Coast Guard received a phone call from Robert Pabillar, a former crew member of the Wilmina.  Pabillar told the Coast Guard that he had evidence that the crew was bypassing the ship's pollution control equipment and discharging oily bilge waste into the ocean.

*See* Eckard Statement, Administrative Record ("AR")[2] 15–17; Simser Statement, AR 18–20;

Toepfer Statement, AR 21–26.

The next day, May 4, 2010, the Wilmina arrived at the port, and the Coast Guard boarded

the ship to conduct its routine Port State Control Inspection.  Port State Control Report of

Inspection, AR 3–4.  The agency issued a Certificate of Compliance ("COC"), certifying that the

vessel had "been examined and found to be in compliance with all applicable U.S. and

international marine safety and environmental protection standards."  Certificate of Compliance,

AR 5–6.  The COC stated that:

> For this Certificate of Compliance to remain in effect, the vessel shall be
> maintained to the safety and construction standards as examined for
> compliance with applicable marine safety and environmental protection
> laws and international conventions.  . . .
>
> 1.  Entries shall be made on this certification in accordance with current
>     instructions for the following types of foreign vessel examinations: . . .
>
>     Other compliance examinations (i.e. – MARPOL [the International
>     Convention to Prevent Pollution from Ships], Ballast Water, etc.) or
>     Deficiency checks . . . .

*Id.*, AR 6.

During that inspection, Pabillar gave one of Coast Guard officers a flash drive with

photos and video, which the inspectors viewed after returning to their office.  Simser Statement,

AR 18.  According to a report from Coast Guard officer Chris Eckard:

---

2       The Administrative Record in this case was filed with the Court on May 15, 2010. [Dkt.
# 9].  An index of the administrative record appears on the docket [Dkt. # 16], but the entire
record was not entered on the electronic docket because of its size.  A copy of the administrative
record may be viewed at the Clerk's Office.  Page citations to the administrative record refer to
the page numbers appearing at the top right corner of each page in the record.

> The video clearly showed a[n] engine room where a bypass hose (magic pipe) was attached to an overboard discharge valve.  The bonnet had been taken out of the valve and that is where the bypass hose had been attached with a flange made for this purpose.  The bonnet and stem could be seen laying on the deck near the valve.  A dark oil-like substance could be seen seeping out of the connection.  The video also showed the entire length of the hose and it connected to the ship[']s piping underneath the deck plates.  There was also a video showing the hiding location of the bypass hose.  At this point it was determined that a MARPOL violation most likely had occurred and the decision was made to perform an expanded MARPOL inspection on the ship.

Eckard Statement, AR 15–17; AVI files, AR 766–68.  As a result, the Coast Guard reboarded the ship later that same day to perform a second, expanded inspection.  *See* AR 27.

At the expanded inspection, the Coast Guard interviewed Pabillar and other crew members, viewed the ship's pollution control and other systems, and collected samples and evidence from the ship.  *See* Eckard Statement, AR 15–16; Simser Statement, AR 19.  Pabillar, who had been terminated for cause from the ship's crew a few weeks earlier for poor work performance, told inspectors that the crew had discharged oily waste while in transit.  *See* AR 19.  He said that motorman Cesar Cruz told him that the ship's crew was bypassing the oily water separator.  AR 15.  Pabillar also told the inspector that he filmed the video provided to the Coast Guard with Cruz.  AR 15–16.

Inspectors interviewed Caesar Cruz, who told them that he helped the ship's second engineer pump oily waste overboard at least four times, and that he thought another fitter, who was no longer a crew member, made the bypass hose about five months before.  Eckard Statement, AR 16.  Cruz identified the valves and pump used to pump oil sludge overboard.  Toepfer Statement, AR 23; photos AR 794, 798–99, 801–03, 805, 808, 811.  Cruz also said that the incinerator, which is supposed to burn oil sludge, had not worked properly for the past two

months.  *Id.*  The Chief Engineer also stated he did not think the incinerator has been working.
*Id.* at 15.

Three days later, on May 7, 2010, Coast Guard inspectors collected samples from the
ship's bilge and sludge tanks, which were sent to a Coast Guard laboratory for analysis.  *See* AR
179–84.

As a result of the second inspection, Coast Guard personnel identified a number of
deficiencies in the ship's pollution control equipment and reporting protocols:

- The incinerator was not working properly.  Eckard Statement, AR 15–17.

- The printer used to record alarms to notify crew of problems with the ship's pollution control equipment was not working.  Toepfer Statement, AR 22; Eckard Statement AR 15.

- The crew was unfamiliar with the vessel's Safety Management System requirements for reporting equipment failures.  Port State Control Report of Inspection-Form B, AR 8.

They summarized their findings as follows:

> A boarding was conducted on the Tank Vessel, WILMINA, on 04 May 10, to conduct an expanded MARPOL inspection.  The T/V WILMINA is [Norwegian] flagged, has a gross tonnage of 79,494 and was boarded in the Port of Corpus Christi, TX.  During the inspection, it was found that oil had been pumped overboard, bypassing the oily water separator, before reaching U.S. waters.  This was demonstrated by a video (CG-05) provided by a whistleblower and interviewing crewmembers (CG-06).  Further investigation found oil in the overboard discharge valve and skin valve (CG-04), also demonstrating that oil had been pumped overboard.  Upon being presented with the Oil Record Book (CG-01), it was found that there was no record of the oil being pumped overboard as required in 33 CFR 151.25(g).  After thorough investigation it was also found that there was no record of unaccounted oil in the oil record book weekly soundings (CG-01).  2 crewmembers came forward and admitted to participating or witnessing the discharge.

Enforcement Summary, AR 27–32.  The Coast Guard listed these deficiencies in the second Port
State Control Report of Inspection issued that day.  AR 7–9 (stating the ship's oily water

separator, a device used to remove oil from the ship's bilge water, was inoperable; a discharge pipe, which was supposed to run between the oily water separator and through the ship's hull, had been removed; and parts of the oily water separator were found in a chemical locker; engine room alarms that were supposed to sound if the pollution control equipment detected a certain level of oil in the water to be discharged were inoperable; and the ship failed to maintain proper records in its oil record book).

On May 21, 2010, the Captain of the Port ("COTP") issued the disputed order, COTP Order No. 093-10, which set forth the agency's findings that the ship had "discharged oily contaminated bilge waste and/or sludge in contravention of MARPOL on several occasions and entered the United States port of Corpus Christi, Texas with a[n] oil record book with false entries." AR 1. The COTP stated: "the willful noncompliance with MARPOL and APPS[3] that occurred on board your vessel creates a threat to the marine environment. . . . Therefore, I am revoking your vessel's Certificate of Compliance in accordance with 46 U.S.C. § 3711(c)." AR 1–2. The order further provided:

> Once your vessel departs port it may not enter the Sector Corpus Christi Marine Inspection Zone and Captain of the Port Zone, as defined in 46 C.F.R. 3.40-35, for a period of three (3) years, or until the vessel has developed and successfully implemented an Environmental Compliance Plan (ECP) to the satisfaction of the U.S. Coast Guard (Commandant CG-5432), 2100 Second Street S.W. Stop 7581, Washington, DC 20593-7581. Successful implementation of an agreed upon ECP must include a period of satisfactory audits for at least a one (1) year period, after which I will

---

3       APPS refers to the Act to Prevent Pollution from Ships, 33 U.S.C. §§ 1901 *et seq*., which implements MARPOL in the United States.

consider allowing it to enter the Sector Corpus Christi Marine Inspection
Zone and Captain of the Port Zone.

Order, AR 2.[4]

## ANALYSIS

Plaintiffs have raised two threshold legal issues that they urge the Court to consider
before going on to address defendants' argument on the merits that the administrative record
supports the Coast Guard's order.  They challenge the severability of the Coast Guard's order,
and they also argue that the agency abused its discretion by departing from previously
established regulations and policies in issuing the order.  Pls.' Opp. & Cross-Mot. at 7–21.
Defendants assert that the Court has already ruled on the scope of the agency's authority so the
law-of-the-case doctrine applies, and the Court should not revisit these matters.  Defs.' Reply to
Pls.' Resp. & Resp. in Opp. to Pls.' Cross-Mot. for Summ. J. [Dkt. ## 42, 44] ("Defs.' Reply") at
3–5, citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988).   Under this
doctrine, "courts generally to refuse to reopen what has been decided."   *Id.* at 817, quoting
*Messinger v. Anderson,* 225 U.S. 436, 444, (1912).   The Court did address the scope of the
agency's statutory authority in its earlier ruling, and its ruling striking down only a portion of the
order was an implicit recognition of its power to do so.   But since neither the parties' prior briefs
nor the ruling expressly addressed the question of the order's severability or whether the agency
violated existing regulations and policies in issuing the order, the Court will take up those issues
here.

---

4       On May 18, 2010, Pabillar was found to have child pornography on his cell phone.  AR
351–354.  He was indicted on June 23, 2010, AR 357–59, and subsequently deported.  On May
21, 2010, the Department of Justice informed plaintiffs that its investigation of the Wilmina for
alleged environmental crimes had been terminated and no criminal charges would be brought
against the vessel or its crewmembers.  Pls.' Opp. & Cross-Mot. at 4.

I.     **The Coast Guard's Order is Severable.**

The Court has ruled that the order's three-year ban of the Wilmina was invalid, but that its requirement that plaintiffs implement an ECP and complete a year of successful audits before being allowed back into U.S. waters "fell well within the scope of the Coast Guard's authority under the statute." *Wilmina Shipping AS v. DHS*, 934 F. Supp. 2d at 13–15.  Plaintiffs assert that because the Court found the first part of the agency's order to be invalid, the Court must declare the entire order invalid:  according to plaintiffs, the Court "is not permitted to deconstruct a challenged agency action and uphold only those portions of the agency's actions which the Court finds to be lawful."  Pls.' Opp. & Cross-Mot. at 8–9, citing *Comcast Corp. v. FCC*, 579 F. 3d 1, 10 (D.C. Cir. 2009 (Randolph, J., concurring).

But the APA specifically provides that a reviewing court may hold unlawful an "agency action," 5 U.S.C. § 706(2)(A), and the definition of agency action "includes the *whole or a part of*" an agency order.  5 U.S.C. § 551(13) (emphasis added); *see also Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) (holding that courts may reject only "part of a rule found to be invalid" because "[i]t would . . . exceed the statutory scope of review for a court to set aside an entire rule where only a part is invalid, and where the remaining portion may sensibly be given independent life").  So the Court rejects plaintiffs' contention that a court is only empowered to strike down a multi-part order in its entirety.

Plaintiffs also argue that because the Court found the three-year ban in the order to be invalid, the alternative requirement for a compliance plan and one year of audits is also invalid because the order is not severable.  Pls.' Opp. & Cross-Mot. at 7–13.  "'Whether an administrative agency's order or regulation is severable . . . depends on the issuing agency's intent.'"  *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997), quoting

*North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984).   In analyzing whether an agency action is severable, courts consider whether the parts of the order are "intertwined" or whether "they operate entirely independently of one another."   *Id.*   In doing so, they examine the purpose of the agency's action and whether the action "sensibly serve[s] the goals for which it was designed" without the severed portion.   *MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 734 (D.C. Cir. 2001); *see also Assoc. of Private Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133, 155–57 (D.D.C. 2012) (holding that when regulations are intended to have different purposes and are not dependent on each other, they are not intertwined).   According to the D.C. Circuit, reviewing courts should ask "whether the [agency] would have adopted the same [result] . . . had the [agency] not erroneously interpreted [the statute]."   *Davis Cnty. Solid Waste Mgmt.* at 1459.   Severance and affirmance of a portion of an administrative regulation is improper if there is "substantial doubt" that the agency would have adopted the severed portion on its own.   *Id.*   And the agency's intent must be rational, meaning that "the remainder of the regulation [can] function sensibly without the stricken provision."   *MD/DC/DE Broadcasters Ass'n*, 253 F.3d at 734.

Plaintiffs maintain that the original two alternatives – the three-year ban and the compliance program with audits – are intertwined and not severable, and they point to the fact that agency counsel stated at the hearing that the two provisions were supposed to operate together as a carrot *and* a stick. Pls.' Opp. & Cross-Mot. at 10–11, citing Tr. of Dec. 4, 2012 Mot. Hr'g ("Tr.") [Dkt. # 25] at 16–17.   They also argue that the text of the order and the agency's orders from administrative appeals support this position. Pls.' Opp. & Cross-Mot. at 11.

In response, defendants emphasize that the order used the disjunctive term "or" when laying out the two possible sanctions – a three year ban or an acceptable compliance plan – thereby indicating that the two avenues were meant to be independent of one another.  Defs.' Reply at 6.  They also argue that the Coast Guard would have issued the order even without the three-year ban because the agency's goal is to protect the marine environment, and the remaining part of the order serves that goal.  Defs.' Reply at 6.

The statements of counsel are not determinative in this case.  *See Davis County* at 1457 (upholding portion of EPA rule despite prior statement of EPA counsel that the entire rule would need to be vacated if part of the rule was invalid).  Counsel's use of the word "and" cannot alter the plain use of the word "or" in the order.  And even if it were appropriate to consider counsel's method of characterizing the order in deciding this issue, the metaphor counsel selected does not prove plaintiff's point.  Just because the agency originally adopted a two-pronged approach, it does not necessarily follow that it could not utilize either a carrot or a stick alone.  In this case, the order imposed *alternative* sanctions, so the Court can clearly find that it was the Coast Guard's intent all along that either one alone would suffice.

Furthermore, although the order does not spell out the agency's intention regarding its severability, it does state that the purpose of the order is to correct the Wilmina's failure to comply with international conventions and standards that govern the safety of crews, vessels, and "the marine environment and U.S. ports and waterways."  Order, AR 1.

> The existing system of audits required by the ISM Code is obviously not being properly implemented by your company on your vessel.  Such a failure can only be corrected by a serious and meaningful commitment by your company which cannot be satisfactorily demonstrated without an additional mandatory oversight system that requires multiple vessel audits by independent auditors to verify compliance.

*Id.* at 1–2.  Given this purpose, the Court holds that the requirement that the vessel develop a successful compliance plan, even without the specter of the alternative sanction of a three-year ban, "sensibly serve[s] the goals for which it was designed."  *MD/DC/DE Broadcasters Ass'n*, 253 F.3d at 734.  The three-year ban, on the other hand, does not serve the purpose of protecting the environment or correcting the Wilmina's deficiencies, since it would have permitted the ship to return to U.S. waters after three years without addressing the underlying environmental violations.  Given this, the Court finds that the order is severable and the agency would have adopted the order without the three-year ban.[5]

## II.   The Coast Guard Did Not Abuse its Discretion by Violating its Regulations and Policies when it Issued the Order.

An agency must follow its own rules, procedures, and policies.  *See Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986).  Various international conventions subject a foreign-flagged vessel to inspection by a country when that vessel is in the country's jurisdictional

---

[5]     Plaintiffs cite portions of the administrative appeals process to support their position, but the cited letters do not support their argument.  Plaintiffs cite the Eighth Coast Guard District's statement that "the Order allows [the owner and operator] to reduce the period of exclusion from U.S. waters from three years to one year if [the vessel owner and operator] successfully implements an effective Environmental Compliance Plan (ECP)." Pls.' Opp. & Cross-Mot. at 11, citing AR 432–435.  They also quote the Commander of the Coast Guard Atlantic Area's statement that, "[t]he Order allows the M/T WILMINA to reduce the period of exclusion from U.S. waters from three years to one upon the successful implementation of an effective Environmental Compliance Plan (ECP) as outlined in the order." *Id.* at 11–12, citing AR 487. And they quote the statement from the Coast Guard Director of Prevention Policy at Coast Guard Headquarters that "[y]ou argue that the three year barment is draconian.  However, you neglect to discuss the other option.  Here, the COTP Order outlined that the M/T WILMINA could demonstrate compliance by implementing an environmental compliance plan (ECP) over a one year period." *Id.* at 12, citing AR 496–508.  All of these statements plainly indicate that the ECP is an *alternative* to the three-year ban and that the two provisions were independent from each other.

waters.[6]  In the United States, this inspection authority is implemented into U.S. law through 46

U.S.C. §§ 3301–18, and the Coast Guard is charged with conducting these inspections through

its Port State Control Program.   U.S. Coast Guard Marine Safety Manual, COMDTINST

M16000.7A ("Marine Safety Manual"), Vol. II (Material Inspection) at Section D, Ch. 2 at D2-

7.[7]

According to plaintiffs, the Coast Guard violated its own policies and regulations

governing inspections and the issuance of COTP orders and control actions when it issued the

May 20, 2010 order.  Pls.' Opp. & Cross-Mot. at 14–21.  Specifically, they cite the following:

- 33 CFR Part 160, Subpart B - Control of Vessel and Facility Operations;

- Marine Safety Manual, Vol. II (Material Inspection) Section D, Ch. 2;

- U.S. Coast Guard Navigation and Vessel Inspection Circular No. 06-03, Change 2, Coast Guard Port State Control Targeting and Examination Policy For Vessel Security and Safety;[8]

---

6       The Ports State Control program implements various international conventions, including SOLAS, International Convention on Load Lines 1966 (ICLL); the International Convention for the Prevention of Pollution from Ships 73/78 (MARPOL); the International Convention on Standards of Training Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 (STCW 95); the International Labor Organization Convention No. 147, the Convention Concerning Minimum Standards in Merchant Ships (ILO 147).

7       A copy of this manual appears on the docket of this case at Dkt. # 49.

8       This document is available at http://www.uscg.mil/hq/cg5/nvic/pdf/2003/NAVIC06_03_Ch2.pdf).

- U.S. Coast Guard Navigation and Vessel Inspection Circular No. 04-05, Port State Control Guidelines For the Enforcement of Management for the Safe Operation of Ships (ISM Code);[9] and

- Marine Safety Manual, Vol. IV (Ports and Waterways Activities).[10]

*See* Pls.' Opp. & Cross-Mot. at 14–15, n.20.  While most of plaintiffs' arguments concerning the validity of the Coast Guard's action seem to be recapitulations of the legal challenge that has already been decided, the Court will address each of them below.

### A.    A criminal conviction is not required.

Plaintiffs first argue that the order imposes a *de facto* sentence of probationary oversight, without first obtaining a criminal conviction, and that "there are no authorizing statutes or regulations that permit [the Coast Guard] to require any vessel owner or operator to implement an ECP outside of a criminal conviction."  Pls.' Opp. & Cross-Mot. at 15–16.  But the Court has already held that the PWSA, 33 U.S.C. § 1228, authorizes the agency to require a ship to satisfy certain requirements before it may reenter U.S. waters and to enforce violations of MARPOL and APPS, beyond the civil and criminal penalties set out in section 1232 of the PWSA. *Wilmina*, 934 F. Supp. 2d at 10–11.

### B.    The Coast Guard did not violate its regulations and policies governing Port State Control inspections.

Plaintiffs next argue the order violates various U.S. laws and applicable treaties governing the actions a state may take following a Port State Control inspection.  Pls.' Opp. & Cross-Mot. at 17.  They emphasize that when the Coast Guard conducted its Port State Control inspection of the Wilmina, the ship already had its own Safety Management System in place, and

---

9    This document is available at http://www.uscg.mil/hq/cg5/nvic/pdf/2005/NVIC%2004-05.pdf).

10    *See* Dkt. # 49.

that it had been issued a Safety Management Certificate by Norway, pursuant to the U.N. Convention on the Law of the Sea. Pls.' Opp. & Cross-Mot. at 17 and n.26, citing 1833 U.N.T.S. 397, *reprinted in* 21 I.L.M. 1261 (1982), Article 92. Plaintiffs further contend there is "absolutely no mention" in the agency's own regulations, policy statements, and procedures of revoking a ship's Certificate of Compliance for a term of years or demanding remedies beyond "mere compliance" with existing conventions, laws, and regulations. Pls.' & Cross-Mot. at 17–18.

The Court already found that the agency's action was fully consistent with its obligation to do just that: to ensure compliance with existing environmental laws. But plaintiffs contend that the Coast Guard violated a policy that was in place at the time of the order:

> Regardless of whether deficiencies must be repaired before commencing cargo operations, departing port, or returning to the U.S., control actions must be based on the control authority provided under domestic laws or international conventions. Compliance with standards other than those implemented under law, regulation or convention cannot be mandated. It is incumbent upon the OCMI/COTP and the boarding team that they thoroughly research requirements to ensure that any control action taken is authorized under an applicable law, regulation or convention.

*Id.* at 18, quoting Marine Safety Manual, Vol. II (Material Inspection), Procedures Applicable to Exercising Control Over Foreign Vessels Under U.S. Jurisdiction, Section D, Ch. 2, at D2-6 (emphasis omitted).

Even if one assumes that the agency was bound by its internal policy manual, there is nothing in this language that forecloses the agency from implementing a remedy as part of a control action. The manual simply instructs the agency and the COTP to ensure that control actions comply with domestic laws and international conventions. Indeed, plaintiffs themselves note that the same manual provides that control actions "may take several forms including

requiring correction prior to returning to the U.S."  Pls.' Opp. & Cross-Mot. at 18 n.29, citing

Marine Safety Manual, Vol. II (Material Inspection), Section D, Ch. 2.

The manual also provides that a COTP order "can be used to implement *a variety of*

*control options*, from simply controlling the vessel's movement as it departs port to detaining the

vessel in port until deficiencies are corrected."  *Id.* at D2-6 (emphasis added).  The manual

further states that COTP orders are authorized by the PWSA, 33 U.S.C. § 1221, and its

implementing regulations of 33 CFR § 160.113.  *Id.*

As the Court has already held, the PWSA authorized the agency to issue the order.

*Wilmina*, 934 F. Supp. 2d at 10–14.  And the Act's implementing regulation states that a COTP

"may prohibit any vessel, subject to the provisions of chapter 37 of Title 46, U.S. Code, from

operating in the navigable waters of the United States . . . if . . . the Captain of the Port

determines that the vessel's history of accidents, pollution incidents, or serious repair problems

creates reason to believe that the vessel may be unsafe or pose a threat to the marine

environment."  33 C.F.R. § 160.113(a).  Accordingly, the Court finds that the agency did not

violate its own Marine Safety Manual in ordering the Wilmina to implement an ECP with audits.

### C.      The Coast Guard did not violate its policies and regulations regarding its enforcement of the ISM code.

The ISM Code sets international standards for safe practices in vessel operation and for

the maintenance of a safe work environment onboard vessels.  *Eisenberg v. Carnival Corp.,* No.

07-22058-CIV, 2008 WL 2946029, at *3 (S.D. Fla. July 7, 2008).   Plaintiffs argue that the order

violates the Coast Guard's published guidance for its enforcement of the ISM code.  Pls.' Opp. &

Cross-Mot. at 19 and n.31, citing the U.S. Coast Guard Navigation and Vessel Inspection

Circular 04-05, Port State Control Guidelines for the Enforcement of Management for the Safe

Operation of Ships (ISM Code) ("Inspection Circular").[11]   They contend that the Inspection Circular and other unspecified policy statements from the agency identify methods through which the agency may ensure that ships correct deficiencies but do not authorize "the long term oversight of the operations of foreign flag vessel." *Id.* at 19.

The Inspection Circular sets forth procedures for the Coast Guard to follow when inspecting ships for compliance with ISM Code Requirements.  Inspection Circular at 5–9.  It also provides procedures for enforcement actions when the agency finds a ship is not in compliance with the ISM Code. *Id.* at 9–13.

Paragraph 8a of the circular governs Port State Control examinations. *Id.* at 5–6.  It provides that the agency should check to verify a ship's compliance with the ISM Code as part of all Port State Control examinations. *Id.*  Further, paragraph 8a(3) states that the Coast Guard "should conduct an expanded examination when clear grounds lead the [Port State Control Officer] to believe that the ship has not effectively implemented its [Safety Management System]." *Id.* at 7.[12]

Paragraph 8b of the circular provides guidance on enforcement actions the agency may take when it finds a ship to be out of compliance with the ISM Code:

---

11      This document is available at http://www.uscg.mil/hq/cg5/nvic/pdf/2005/ NVIC%2004-05.pdf.

12      This follows the requirements in MARPOL. *See* MARPOL Art. 5 ¶ 2 (providing that an inspection by a port state "shall be limited to verifying that there is on board a valid certificate, unless there are clear grounds for believing that the condition of the ship or its equipment does not correspond substantially with the particulars of that certificate," in which case "the Party carrying out the inspection shall take such steps as will ensure that the ship shall not sail until it can proceed to sea without presenting an unreasonable threat of harm to the marine environment").

> COTP Orders.  A COTP Order is an important tool used when it is necessary to control or restrict the vessel's movement or operations for safety or security reasons.  Only the COTP may use such an order to implement a variety of control actions, including controlling the vessel's movement as it enters or departs a port.  The COTP may also use such an order to expel a vessel from port.  The COTP may initiate enforcement action if a ship fails to comply with a COTP Order.  A COTP Order may be used in addition to or in lieu of revocation of a vessel's COC.  Although, it is not a substitute for pursuing and processing a detention and completing the associated notifications and administrative requirements under the applicable provisions of SOLAS, the ISPS Code, MARPOL, STCW, or the Load Line Convention.

*Id.* at 9, ¶ 8b(2).

Like the Marine Safety Manual, the Inspection Circular states that a COTP may implement "a variety" of control actions, which are not limited to the examples provided. *See Puerto Rico Mar. Shipping Auth. v. ICC,* 645 F.2d 1102, 1112 n.26 (D.C. Cir.1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list of carriers that follows is illustrative, not exclusive.")  Though plaintiffs correctly note that COTP controls are to be "directed to specific situations and hazards," Pls.' Opp. & Cross-Mot. at 19, citing 33 C.F.R. §160.101, this same regulation authorizes COTPs to prohibit a ship from operating in U.S. waters if the COTP "determines that the vessel's history of accidents, pollution incidents, or serious repair problems creates reason to believe that the vessel may be unsafe or pose a threat to the marine environment."  33 C.F.R. § 160.113.  Accordingly, the Court holds that the agency's

order does not violate its regulations and internal guidance on the enforcement of the ISM Code.[13]

### D.    The Coast Guard did not violate its policies and regulations regarding Certificates of Compliance.

Plaintiffs also argue that the Coast Guard violated regulations promulgated to guide "stakeholders through the process of reinstating or obtaining a Certificate of Compliance."  Pls.' Reply at 12 n.18, citing 46 C.F.R. Part 153.  This regulation is titled "Ships Carrying Bulk Liquid, Liquefied Gas, or Compressed Gas Hazardous Materials."  46 C.F.R. Part 153.

Subpart A of the regulation sets forth general provisions.  Within it, Section § 153.15, titled "Conditions under which the Coast Guard issues a Certificate of Inspection of Certificate of Compliance," provides that the Coast Guard will issue a certificate to a ship from a MARPOL signatory country if:

---

13      Plaintiffs suggest that the order's requirement for an ECP with a year of successful audits violates the Inspection Circular.  Pls.' Opp. & Cross-Mot. at 19 n.33, quoting Inspection Circular at 8–9 ("When working with Flag Administrations or RO's to rectify ISM related nonconformities, the COTP/OCMI can only recommend but not require an external audit.") (emphasis omitted).  But the provision plaintiffs cite governs a Port State Control Officer's *expanded examination* of a ship's Safety Management System.  As discussed above, the provision governing *enforcement* actions for non-conformities with the ISM Code authorizes COTPs to issue "a variety of control actions" to address a ship's non-conformance with the ISM Code.  *Id.* at 9, ¶ 8b(2).

Plaintiffs also note in their reply that the Marine Safety Manual allows the agency to recommend, but not mandate, that foreign ships to undergo external third party audits.  Pls.' Reply at 11 n.17, citing U.S. Coast Guard Marine Safety Manual, COMDTINST M16000.7A, Volume IV at 8–9 (available at http://www.uscg.mil/directives/cim/16000-16999/CIM_ 16000_ 9.pdf).  The cited document is titled "Engineering Systems" and concerns electrical and mechanical systems as they relate to the marine safety program.  Given the pagination of the various sections of the document and no obvious provisions governing audits of foreign ships in the document, it is not clear to the Court what portion of this document plaintiffs intend to rely upon in making this argument, but new arguments set forth in a reply do not support a grant of summary judgment in any event.  *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992) (referring to the "rule against entertaining new arguments raised in reply briefs" as a prudential doctrine applied by courts).

(1) The person wishing the Certificate of Compliance follows the procedures under § 153.9;

(2) The ship has an IMO Certificate issued by its Administration and endorsed with the name of the hazardous material or NLS if the ship's Administration is signatory to MARPOL 73/78;

(3) The ship meets the requirements of this part applying to United States ships . . . ; and

(4) The ship meets any additional design and equipment requirements specified by the Commandant (CG–ENG).

46 C.F.R. § 153.15(b).  Section 153.9, referenced above, sets forth the procedures for applying for a COC and lists the documents a foreign flag vessel from a MARPOL signatory country – like the Wilmina – must present to apply for a COC and indicates where the application must be sent.  *See* 46 C.F.R. 153.9(a).  So Subpart A explains the documents required to obtain a COC and where the documents must be submitted.

Subparts B–D of the regulation set forth the procedural and technical requirements that a ship must be satisfy in order to obtain a COC to carry hazardous liquid cargo.  *See id.* §§ 153.190–153.812 (design and equipment requirements); *id.* §§ 153.900–153.1504 (operations); and *id.* §§ 153.1600–153.1608 (test and calculation procedures).  Section 153.808, titled "Examination required for a Certificate of Compliance," provides that before a vessel receives an initial or a reissued Certificate of Compliance, the vessel must call at a U.S. port for an examination in which the Coast Guard determines whether or not the vessel meets the requirements of this chapter.  46 C.F.R. § 153.808.  And 153.809, titled "Procedures for having the Coast Guard examine a vessel for a Certificate of Compliance," details when and to whom the ship's owner must request the examination, § 153.809(a), and what plans the ship must have available to the Marine Inspector during the exam, including a general arrangement (including the location of fire fighting, safety, and lifesaving gear), a capacity plan, a schematic diagram of

cargo piping on deck and in tanks, and a schematic diagram of cargo tank vent piping. § 153.809(b).   So these sections explain the technical requirements necessary to obtain a Certificate of Compliance and further detail the documentation a ship must have available during a COC examination.

But the regulations do not detail the steps to be followed to have a COC reinstated after the vessel has been found to have violated MARPOL or APPS.[14]   A ship that has a COC must continue to comply with the COC's requirements to maintain it.   *See* Certificate of Compliance at 2, AR 5–6 (stating the Wilmina must meet "all applicable U.S. and international marine safety and environmental protection laws").   If a COC is suspended or revoked because "the vessel does not comply with the conditions under which the certificate was issued," 46 U.S.C. § 3711(a), the PWSA authorizes the Coast Guard determine in its discretion when the ship may return:

> if the owner or operator of such vessel proves, to the satisfaction of the Secretary, that such vessel is no longer unsafe or a threat to the marine environment, and is no longer in violation of any applicable law, treaty, regulation or condition, as appropriate.

33 U.S.C. § 1228(b).

The regulation implementing this statute specifies that the COPT may authorize reentry "if the owner or operator proves, to the satisfaction of the District Commander or Captain of the Port that has jurisdiction, that the vessel is no longer unsafe or a threat to the environment, and that the condition which gave rise to the prohibition no longer exists."   33 C.F.R. § 160.113(d). And the technical and procedural requirements that plaintiffs rely upon in 46 C.F.R. Part 153 do

---

14      Section 153.902 provides that a ship's Certificate of Compliance shows its expiration date and the endorsement on a COC is invalid if the vessel does not have a valid IMO Certificate of Fitness, and the endorsement becomes valid again once the ship has the IMO Certificate of Fitness revalidated or reissued.   46 C.F.R. § 153.902.   The note to this regulation refers to Section 153.809 for procedures for having a COC reissued.   *See* 46 C.F.R. § 153.902 note.

not limit the agency's authority under the PWSA or its implementing regulations – which leave it to the District Commander or COTP to determine when a vessel no longer poses a risk to the environment and the remedy necessary to address the issue.  Accordingly, the Court holds that the agency's order does not violate 46 C.F.R. Part 153.

> **E.**   **The fact that the Coast Guard has not issued an order like the one against the Wilmina does not make it arbitrary and capricious.**

Finally, plaintiffs assert the fact that the agency has never before issued an order like the one against the Wilmina – despite having detained 1,200 vessels from 2000 to 2012 – supports their argument that the order was arbitrary and capricious.  Pls.' Opp. & Cross-Mot. at 20–21. They argue the order reflects a "dramatic departure from customary agency practice and precedent," which required the Coast Guard to provide a specific legal and factual basis for its actions.  Pls.' Reply at 10, citing *New York Cross Harbor R.R. v. Surface Transp. Bd.*, 374 F.3d 1177, 1183 (D.C. Cir. 2004).  They contend the agency failed to provide the legal and factual basis for its actions.  *Id.*, citing AR 1–2, AR 188–190, AR 432–435, AR 487, AR 496–508.

Plaintiffs cite precedent that holds that an agency may not reverse course in the face of existing precedent without providing a reasoned analysis.  *New York Cross Harbor R.R.*, 374 F.3d at 1181 (holding that an "agency acts arbitrarily and capriciously if it reverses its position in the face of a precedent it has not persuasively distinguished") (internal citations omitted).  But this case does not involve the unexplained abandonment of an established policy position, even if the agency's action was unprecedented.  *See* Pls.' Reply at 9 and 11 n.14 (characterizing the order as "unprecedented"); Tr. at 7–8 (expressing defendants' position that the order reflected the development of new policy:  "[W]e perceive this to be a situation where the agency has to develop a policy in order to implement the statute. . . .  The Coast Guard, the United States, take

the position that the agency has the ability, indeed has to develop a policy that balances the needs of shipping with the need to protect the environment.  And that's exactly what it's doing here.").

An "agency may not 'depart from a prior policy *sub silentio* or simply disregard rules that are still on the books,'" *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1235, quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 514–16 (2009), but when an agency changes policy, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* (emphasis in original).  It is enough that new policy is "permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* (emphasis in original).  Thus, the order against the Wilmina is not arbitrary and capricious merely because the agency has not issued one like it before.  The question is whether the order is permissible under the statute, whether there are good reasons for it, and whether the agency reasonably finds the new approach to be superior.

The Court has already ruled that the part of the order imposing an ECP with audits is permissible under the applicable statutes.  *Wilmina*, 934 F. Supp. 2. at 9–10 (holding that Chapter 37 of Title 46 gives the Coast Guard "broad authority to issue and revoke certificates of compliance . . . based on its assessment of whether the vessels are in compliance with environmental requirements" and mandates the agency to revoke a certificate when it determines a vessel is out of compliance).  So the relevant question is "whether there are good reasons" for the order, and that inquiry brings the Court back to the fundamental question raised by the motion for summary judgment.

III.    **The Coast Guard's Order is Reasonable and Supported by the Record.**

Plaintiffs challenge the merits of the Coast Guard's order on two broad grounds:  they contend that the whistleblower was untrustworthy, and that the evidence does not support the agency's findings. Pls.' Opp. & Cross-Mot. at 22–27.  The Court will uphold the order.

A.    **The whistleblower's credibility and honesty were not the basis for the agency action.**

Plaintiffs submit that Pabillar, whose call initiated the expanded inspection of the ship, was untrustworthy and unreliable, and that his credibility undermines the agency's investigation and order.  Pls.' Opp. & Cross-Mot. at 25.  They assert that Pabillar had a motive to fabricate the violations he reported because he was fired shortly before he blew the whistle.  *Id.* at 22–25. Plaintiffs also contend that Pabillar was not knowledgeable about shipping and was that he was otherwise untrustworthy, since he was relieved of duty for poor performance, he and Cruz were wrong about where the ship was located when they made the video they gave to the Coast Guard, and Pabillar was found to be in possession of child pornography.  *Id.* at 24–27.  But whether Pabillar is incompetent, untrustworthy, or even immoral does not bear on the validity of the Coast Guard's order because the order was based on its agents' independent investigation, not merely on the report that prompted the investigation.

Plaintiffs complain that Pabillar and Cruz told the Coast Guard the events in the video took place on April 24, 2010 but investigators "change[d] the date" to April 29, 2010, and they conclude that this proves the investigation was "biased, partial and faulty."  *Id.* at 24, citing Enforcement Summary, AR 27–31.

The Enforcement Summary states:

> 2 crewmembers came forward and admitted to participating or witnessing the discharge.  They said that it occurred in the Atlantic Ocean, near Bermuda Island, sometime around the 24APR10(CG-06).   It was

25

determined by the vessel[']s bridge log(CG-02) that the discharge most likely occurred on 29ARP10, based upon the position of the vessel in the Atlantic ocean and compared to the interview with the informants.

Enforcement Summary, AR 27–31.   This description indicates that the date and location provided by Pabillar and Cruz were estimates, as did the notes of one of the Coast Guard investigators.   *See* Eckard Statement, AR 15–16 (Cesar Cruz said the video was taken "on or about April 24th, 2010" and that the vessel was located somewhere "around Bermuda Island"). So, there is no inconsistency here.   Moreover, the summary does not show that the agency changed the date to "make certain that the made up date would comport with the false story given by Pabillar and Cruz," as plaintiffs argue.   Pls.' Opp. & Cross-Mot. at 24.   Rather, it shows the agency was doing its best to pinpoint the date and location based on all the information it had.   In any event, whether the video was taken on the 24th or the 29th near Bermuda or elsewhere does not undermine the conclusion that the video was taken a few weeks before the ship arrived in Corpus Christi, Texas.

Plaintiffs also argue that Pabillar "mocked up" the video, *id.* at 22–23 (citing AR 685 and 441), suggesting that he staged the violation.   But the parts of the record plaintiffs cite for this argument do not to support that conclusion.   First, the document at AR 441 is merely a letter from plaintiffs' counsel stating plaintiffs' position that the video was a fabrication.   This does not constitute evidence.   Second, Coast Guard Lieutenant Toepfer's notes of his interview with Cruz simply indicate that Pabillar "convinced [Cruz] to take video."   AR 685.   Pabillar's role in initiating the creation of the video does not demonstrate that what the video depicted as manufactured.   Indeed, while plaintiffs make much of Pabillar's motive and lack of credibility, they cite no evidence to suggest that Cruz – who had worked on the ship for fourteen months, was a current crew member in good standing, and informed investigators that he witnessed the

26

improper use of the bypass hose to dispose of oily waste, AR 684 – had any motive to lie to the inspectors at all.

### B.        The record shows the agency action was reasonable.

Finally, plaintiffs challenge the Coast Guard's order as unreasonable based on the evidence in the administrative record.  An agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 415, and a court must not "substitute its judgment for that of the agency."   *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. at 43. Where an agency's determination "requires a high level of technical expertise, [a court] must defer to the informed discretion of the responsible federal agencies." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989), quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) (internal quotation marks omitted).   The deference accorded to an agency is not unlimited, however:   "the presumption of agency expertise may be rebutted if its decisions are not reasoned."  *Canales v. Paulson*, Civ. 06-1330-GK, 2007 WL 2071709, at *4 (D.D.C. July 16, 2007), citing *ALLTEL Corp. v. F.C.C.,* 838 F.2d 551, 562 (D.C. Cir. 1988).

### 1.        The Coast Guard's Findings

The Coast Guard determined that the Wilmina had (1) "discharged oily contaminated bilge waste and/or sludge in contravention of MARPOL on several occasions," (2) "entered the United States port of Corpus Christi, Texas with a[n] oil record book with false entries," and that (3) "the ship's Master and Chief Engineer were unfamiliar with and failed to comply with the Safely Management System (SMS) for the vessel with regard to reporting critical equipment casualties and maintaining records and engine room alarms."  AR 1.

Its conclusion that the ship had illegally discharged bilge waste was based on a number of findings:

- Two crew members told investigators that they participated or witnessed improper discharges.  Enforcement Summary, AR 27–32; AR 684.

- The ship's incinerator was not working properly.  Eckard Statement, AR 15–17.

- The discharge pipe, which was supposed to run between the oily water separator through the ship's hull, had been removed.  Second Port State Control Report of Inspection, AR 7–9.

- Parts of the oily water separator were in a chemical locker.  *Id.*

- The oily water separator was clogged with sludge.  *See* Defs.' Mem. at 6, citing Independent Technician Report, AR 174–75.

- The oil record book showed that sludge moved out of the tank instead of into the tank.  *Id.*, citing Oil Record Book & Evidence Review, AR 171–73.

- Oil was found in the overboard discharge valve.  AR 27.

- The printer used to record alarms to notify crew of problems with the ship's pollution control equipment was inoperable.  Toepfer Statement, AR 22; Eckard Statement, AR 15.

- The captain told Coast Guard personnel that no reports had been made to the company responsible for the ship about the broken oil water separator or incinerator.  Toepfer Statement, AR 24.

As a result of the findings about the ship's pollution control equipment, the Coast Guard made the additional findings about its oil record book and the Master and Chief Engineer's failure to comply with the vessel's Safety Management System.  AR 1.

### 2.  Plaintiffs' Arguments

Plaintiffs attack the evidence underlying the Coast Guard's findings on multiple grounds.

### a)  The laboratory reports

Plaintiffs contend that oil samples taken from the ship demonstrate that the Wilmina did not discharge oily waste into the ocean.  They contend the Coast Guard's own laboratory analysis shows that oil from the ship's discharge pipe, stem, and skin valve did not match oil

from the bilge tanks and incinerator, indicating that Pabillar intentionally contaminated the overboard discharge pipe to create the environmental violation he reported to the agency.  Pls.' Opp. & Cross-Mot. at 27–28.

The laboratory report states that samples from the overboard discharge pipeline, stem, pipe section, and skin plate (samples 4, 6, 7, and 8) have similar characteristics to the overboard discharge sample (sample 1).  AR 181, 184 (reporting that there were "sufficient important similarities to indicate" these samples "are all related to each other through a common source of petroleum oil.  However, a few small differences preclude a conclusive match").  The report also states that samples from the overboard discharge pipeline, stem, pipe section, and skin plate (samples 4, 6, 7, and 8) had different characteristics from the samples taken from the bilge tanks and incinerator (samples 2, 3, and 5).  AR 182.

Defendants explain that oil samples may not match because as a vessel continues to operate, "bilge tanks gradually refill with waste that differs chemically from that which was previously discharged, changing the petroleum 'fingerprint.'"  Defs.' Reply at 20.

Understanding the importance of the laboratory report to the agency's investigation requires a high level of technical expertise – not only about the chemical composition of the waste that oceangoing vessels produce but also about these vessels' mechanical systems and how they operate generally.  Recognizing this, the Court is mindful that when an agency's determination "requires a high level of technical expertise," it must "defer to the informed discretion" of the responsible federal agency.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (internal citations omitted).  Here, the laboratory analysis states that the characteristics of the oil from the overboard mechanisms (samples 1, 4, 6, 7, and 8) were different from the characteristics of samples taken from the bilge tanks and incinerator (sample 2, 3, and 5).  AR

182.  The importance of this analysis, given how the petroleum "fingerprint" of a ship's waste can change and in light of the other evidence collected by the agency, is properly left to the discretion of the responsible agency, and the Court cannot find that this circumstance alone undermines the agency's stated reasons for issuing the order, given the record as a whole.  The record indicates witness statements and other findings concerning the state of the pollution control equipment that corroborated Pabillar's account.

### b)      The initial Port State Control inspection

Plaintiffs cite the Coast Guard's first Port State Control inspection report of May 4, 2010 to argue that the ship's pollution control equipment had in fact been functioning properly all along.  Pls.' Opp. & Cross-Mot. at 28–31 (contending the incinerator and oily water separator were working), citing the Coast Guard's Foreign Tank Vessel Examination Book, AR 373–426 and the first Port State Control report, AR 3–4.  But the first inspection was a cursory one:  the Port State Control inspection is "a walk through examination and visual assessment of a vessel's relevant components, certificates and documents . . . accompanied by limited testing of systems and the crew."  Marine Safety Manual, Vol. II (Material Inspection), Procedures Applicable to Exercising Control Over Foreign Vessels Under U.S. Jurisdiction, Section D, Ch. 2 at D1-7. When an inspection "reveals questionable equipment, systems, or crew incompetence, the boarding team may expand the examination to conduct such operational tests or examinations as deemed appropriate."  *Id.*  So the fact that the first Port State Control report for the Wilmina did not identify a problem with the incinerator or the oily water separator does not preclude a finding, after a more thorough examination, that they were not working.

Indeed, at the second, expanded inspection of May 4, 2010, multiple crew members told Coast Guard personnel that the incinerator had been broken for two months before arriving in

Corpus Christi.  *See* Notes of Toepfer, AR 684; Toepfer Statement, AR 22 ("The Second Engineer stated they had been having problems with the incinerator and it had not always worked properly."); Eckard Statement, AR 15 ("We asked the Chief Engineer if the Incinerator was working and he stated that he did not think it had been working."); AR 15–16 (noting that Pabillar also "stated that the incinerator had not been working until it was fixed prior to arriving to the U.S.").  Plaintiffs do not argue that these crew members had any motive to lie, and the Court can credit these statements.  *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 81 (D.D.C. 2011) ("[A]bsent clear error, 'an agency's credibility decision normally enjoys almost overwhelming deference.'"), quoting *Sasol N. Am. Inc. v. NLRB,* 275 F.3d 1106, 1112 (D.C. Cir. 2002); *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n*, 466 F.2d 394, 414 (D.C. Cir. 1972) ("Credibility determinations within the agency's sphere of expertise are peculiarly within its province, and courts will upset them only if made irrationally."); *see also Bean v. Chater*, 77 F.3d 1210, 1213 (10th Cir. 1995) ("Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.") (citation omitted); *NLRB v. McCullough Envtl. Serv., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993) ("When findings of fact rest upon credibility determinations, we defer to the NLRB's findings and will overturn them only in rare circumstances."); *DeSarno v. Dep't of Commerce*, 761 F.2d 657, 661 (Fed. Cir. 1985) ("[T]his Court cannot substitute a contrary credibility determination based on a cold paper record.").  Also, the inspectors found oily rags around the incinerator, which indicated that the incinerator was not operating.  Defs.' Reply at 13, citing AR 15.

Plaintiffs also complain about the agency's handling of the ship's oil content meter, stating that inspectors had crew members remove the meter to search its memory even though

they were told the device had no internal memory.  They also state that the meter did not work when it was reinstalled because a crew member not trained on the device was asked to reinstall it.  Pls.' Opp. & Cross-Mot. at 30–31.  But plaintiffs fail to demonstrate why these actions – even if they were flawed – undermine the Coast Guard's conclusions.  The agency found a series of other irregularities involving the oil content meter:  its connections were corroded, and the printer used to record alarms that notify crew when the meter was not working had generated no alarm printouts since September 2009.  Defs.' Mem. at 5, citing AR 22.  Further, the agency found that the ship's crew was unfamiliar with the vessel's Safety Management System requirements for reporting equipment failures, like the broken printer.  Defs.' Mem. at 6–7, citing Second Port State Control report, AR 8.  *See also* Toepfer Statement, AR 24.  Plaintiffs say nothing to rebut or explain these deficiencies.

### c)      The oil record book

Plaintiffs next point to the fact that there were regular entries in the oil record book from March 1 through April 30, 2010 that showed the incinerator was operating.  Pls.' Opp. & Cross-Mot. at 29 (stating the incinerator was used forty-two times to dispose of sludge and oily water), citing the Oil Record Book, AR 107–137.  But these entries do not comport with the statements of the Chief Engineer, the Second Engineer, and motorman Cruz, who each reported that the incinerator had not been working.  Toepfer Notes, AR 684; Toepfer Statement, AR 22; Eckard Statement, AR 15–16.  And even if the incinerator had been working, the record indicates it did not reach the temperature needed to burn sludge.  AR 16 (reporting statement of Pabillar that the incinerator "would run but that they could not get it hot enough to burn sludge").

Nor do the entries undermine the agency's analysis of other entries in the oil record book. The Coast Guard's review of the oil record book explains that "[n]ormally the sludge tank is the

final resting ground for oily waste/sludge" and there is "no further processing" of this waste other than incinerating it or discharging it ashore.  AR 171.  But the oil record book indicated that oily waste moved in the opposite direction, from the sludge tank to the bilge settling tanks, prompting the agency to ask:  "Why are transfers from the sludge tank to the sludge/bilge settling tank which is subsequently transferred to the bilge tank taking place?"  AR 171.  The agency concluded that sludge was pumped backwards through the system then discharged overboard, because the oil record book did not otherwise account for its disappearance.  Defs.' Mem. at 6. So the fact that there were some regular entries in the oil record book stating that the ship incinerated sludge on some occasions does not prove that the incinerator worked properly at all times, or that oily waste was not improperly disposed overboard, given the statements of crew members and other entries in the oil record book.  Again, mindful that the type of technical analysis required to understand the evidence amassed by the agency requires the Court to exercise deference, the Court cannot find that the agency's conclusion are not reasoned based on the record before it.

### d)      Prior inspections of the Wilmina

Finally, plaintiffs point to numerous prior inspections of the Wilmina to show that the ship was in compliance with all applicable environmental requirements when the agency issued its order.  Pls.' Opp. & Cross-Mot. at 31–35.  They cite a Coast Guard Port State Control inspection from November 27, 2009 that found the ship "in excellent condition and crew well trained."  *Id.* at 31–32, citing AR 239.  They also rely on the May 4, 2010 initial Port State Control inspection.  *Id.*   They further state that the vessel's classification society, DNV, had regularly examined the ship and found it in compliance with the vessel's Safety Management System, *id.* at 33, and that in August 2009, the ship underwent a comprehensive internal ISM

audit by the vessel's operator and was in compliance with all applicable safety, security and environmental compliance practices.  AR 236–238.  Finally, plaintiffs point out that they conducted self-assessment inspections of the ship, which were supplemented by numerous third-party vetting inspections.  Pls.' Opp. & Cross-Mot. at 34.

But even if the ship did pass these previous inspections, the Coast Guard's order was not based on the ship's prior inspection history:  it was based on the May 4, 2010 inspections.  Indeed, the agency recognized that the ship had no prior violations.  Enforcement Summary, AR 31 (stating "no prior similar violations were found").  Accordingly, the Court finds that these multiple prior inspections do not undermine the agency's findings given the record before the Court.

While the "presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned," *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997), citing *ALLTEL Corp. v. FCC*, 838 F.2d 551, 562 (D.C. Cir. 1988), the Court cannot find based on the record before it and the deference due to the agency that the Coast Guard's order was arbitrary and capricious.

## CONCLUSION

For the reasons set forth above, the Court will grant defendants' motion for summary judgment and will deny plaintiffs' motion for summary judgment.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  December 2, 2014